## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE STATE CONFERENCE OF
PENNSYLVANIA ("NAACP-SCP"), ELECTION REFORM
NETWORK, RICHARD BROWN, ANGEL COLEMAN,
and GENEVIEVE GEIS,

                    Plaintiffs,                        08 Civ. _____

– against –                                             **COMPLAINT**

PEDRO A. CORTÉS, SECRETARY OF THE
COMMONWEALTH OF PENNSYLVANIA; and
CHET HARHUT, COMMISSIONER, BUREAU OF
COMMISSIONS, ELECTIONS AND LEGISLATION,
PENNSYLVANIA DEPARTMENT OF STATE,

                    Defendants.

------------------------------------------------------------------------x

        Plaintiffs, the National Association for the Advancement of Colored People State

Conference of Pennsylvania ("NAACP-SCP"), the Election Reform Network, Richard Brown,

Angel Coleman, and Genevieve Geis, by and through their attorneys, the Public Interest Law

Center of Philadelphia, Emery Celli Brinckerhoff & Abady LLP, and Voter Action, as and for

their Complaint allege as follows:

### NATURE OF THE CASE

        1.      This civil rights action is brought to enforce the most fundamental right secured

by the United States Constitution:  the right to vote.

        2.      In Pennsylvania this year, an unprecedented interest in voting, a record number of

newly registered voters, and a well-established history of widespread electronic voting machine

failures have converged to create a perfect storm that, left unaddressed, unquestionably will

result in the disenfranchisement of substantial numbers of citizens.  Fortunately, the remedy for this grave threat to the franchise is simple and places only the slightest of burdens on the State: the provision of emergency paper ballots when half or more of the voting machines in any precinct simultaneously fail.

3.  In the face of the extraordinary stresses that our election apparatus will face this year, the new rule promulgated by the Pennsylvania Secretary of the Commonwealth directing the use of emergency paper ballots only when *all* of the voting machines in a precinct fail is nothing short of perverse.  It rests on the specious proposition that remedial action is only required in the most dire of circumstances – when no machines work at all – and that no remedy whatsoever is appropriate where, as here, the record demonstrates an overwhelming likelihood that substantial numbers of precincts will have half or more – but not all – of their electronic voting machines fail.

4.  Although state officials generally have wide discretion to administer elections in the manner they see fit, this is the rare case in which the Secretary is playing with fire to a constitutionally intolerable degree.  Given the certainty that electronic voting machines will fail – recognized by the state's own certification expert – and given the dramatic impact that every failure has on the affected precinct – because the vast majority of precincts have no more than two or, at most, three machines – this Court should direct the Secretary of the Commonwealth to ensure that local election officials provide voters with paper ballots if 50% or more of the voting machines in a precinct become inoperable.  This modest intervention will allow all of those who wish to vote the opportunity to do so in a timely manner and without undue delay, while imposing only a negligible burden on the State and local election officials.  In this historic year,

and given the gravity of the threat to the franchise, surely the Constitution requires this minimal safeguard.

## JURISDICTION AND VENUE

5.      This action arises under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a), and 2201.

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

8.      Plaintiff National Association for the Advancement of Colored People State Conference of Pennsylvania ("NAACP-SCP") is a non-partisan organization operating in Pennsylvania and is affiliated with the National Association for the Advancement of Colored People operating across the United States.  NAACP-SCP has 15,000 members in 46 branches across the state.  Among other things, NAACP-SCP is dedicated to ensuring that all eligible Pennsylvania citizens are given a full and equal opportunity to exercise their fundamental right to vote.  NAACP-SCP is also dedicated to ensuring that Pennsylvania citizens of color do not suffer disparate treatment when exercising their fundamental right to vote.  In furtherance of these purposes, NAACP-SCP conducts voter registration and education efforts.  During the 2008 election season, NAACP-SCP is involved in the distribution of "You Have A Right To Vote" cards, which are designed to inform all voters of their rights and requirements and to promote equal participation in the electoral process.  NAACP-SCP conducted these and similar efforts prior to the 2004 elections, the 2006 mid-term elections, and the 2008 primary elections, and expects to continue to do so in connection with future elections.  NAACP-SCP and its members

are aggrieved by Defendants' actions and omissions described in this Complaint because they substantially impede NAACP-SCP's ability to further its goals and institutional purpose of advancing voters' full and meaningful participation in the electoral process by registering to vote, voting, and having their votes counted on a fair and equal basis and because NAACP-SCP's resources are being diverted and drained by the need to address the voting inequities and irregularities that continue to occur throughout Pennsylvania.  NAACP-SCP's members also have been specifically aggrieved by Defendants' actions, which have infringed their fundamental right to vote and to equal protection.  It is reasonably anticipated that these and/or other members of NAACP-SCP will be similarly aggrieved by Defendants' action in the future absent injunctive relief.  The aggrieved individual members of NAACP-SCP have standing in their individual capacity, but neither the claims asserted nor the relief requested herein requires the participation of NAACP-SCP's individual members to vindicate their individual rights.

9.     Plaintiff Election Reform Network is non-partisan grassroots citizens association committed to protecting the integrity of elections and strengthening American democracy. Based in Montgomery County, Pennsylvania along with allies in Philadelphia and across the Commonwealth, the Election Reform Network is aggrieved by Defendants' actions and omissions described in this Complaint because they substantially impede the Election Reform Network's ability to further its goals and institutional purpose of advancing voters' full and meaningful participation in the electoral process by registering to vote, voting, and having their votes counted on a fair and equal basis.

10.     Plaintiff Richard Brown is a registered voter in Pennsylvania.  Defendants' conduct imposed a significant hardship on Mr. Brown's exercise of the franchise during the

April 22, 2008 primary election.  Mr. Brown intends to vote in the election on November 4, 2008.

11.     Plaintiff Angel Coleman is a registered voter in Pennsylvania.  Defendants' conduct imposed a significant hardship on Ms. Coleman's exercise of the franchise during the April 22, 2008 primary election.  Ms. Coleman intends to vote in the election on November 4, 2008.

12.     Plaintiff Genevieve Geis is a registered voter in Pennsylvania.  Defendants' conduct imposed a significant hardship on Ms. Geis's exercise of the franchise during the April 22, 2008 primary election.  Ms. Geis intends to vote in the election on November 4, 2008.

13.     Defendant Pedro A. Cortés is the Secretary of the Commonwealth for the Commonwealth of Pennsylvania (the "Secretary") and is the chief elections officer for Pennsylvania.  25 Pa. Stat. Ann. § 2621.  The Secretary is sued in his official capacity for actions taken under color of law.

14.     As chief elections officer, the Secretary is responsible for the entirety of the voting process in each of Pennsylvania's 67 counties and is empowered with broad authority to carry out that responsibility.

15.     The Secretary has the authority to examine and reexamine voting machines and to approve or disapprove them for use in Pennsylvania.  25 Pa. Stat. Ann. § 2621(b).

16.     The Secretary has the authority to issue directives or instructions to the County Boards of Elections concerning the implementation of electronic voting procedures and the operation of electronic voting systems.  25 Pa. Stat. Ann. § 3031.5(a)

17.     The Secretary is charged with receiving reports from all County Boards of Elections, including information on voting system errors, difficulties, and other election data, and

has the authority to demand any further reports from the County Boards of Elections as he deems necessary.  25 Pa. Stat. Ann. §§ 2621(e), 2621(e.1).

18.     The Secretary is required to establish a system for the remedy of complaints received regarding Pennsylvania's administration of the provisions of Title III of the Help America Vote Act of 2002.  25 Pa. Stat. Ann. § 2621(h).

19.     The Secretary has exercised his broad authority to regulate the election process in Pennsylvania by, among other things, issuing directives to the County Boards of Elections concerning the use, implementation and operation of electronic voting systems by the County Boards of Elections.  One such directive at issue in this case was issued by the Secretary on September 3, 2008.

20.     Defendant Chet Harhut is the Commissioner of the Pennsylvania Department of State's Bureau of Commissions, Elections and Legislation.  Commissioner Harhut is responsible for the supervision of the Bureau, which oversees the Commonwealth's electoral process. Commissioner Harlut is sued in his official capacity for actions taken under color of law.

## FACTS

**A.     The Electronic Voting Machines That Will Be Used in Pennsylvania on Election Day Are Prone to Breakdowns**

21.     The fact that electronic voting machines are prone to errors in counting the votes that have been cast is well established and has been widely reported.  This case involves a somewhat different but no less troubling issue:  the demonstrated tendency of electronic voting machines, including those that will be used in Pennsylvania on Election Day, to break down and cease functioning altogether.

22.    The federal Election Assistance Commission ("EAC") has promulgated performance standards that have been adopted by the Secretary and imposed upon all electronic voting machines used in Pennsylvania.  The EAC standards measure machine reliability in terms of "mean time between failures" ("MTBF") – that is, the average interval between system failures or breakdowns.  Section 3.4.3 of the EAC's 2002 Voting System Performance and Test Standards require that the MTBF shall be at least 163 hours.

23.    Unfortunately, empirical research has demonstrated that electronic voting machines are prone to break down and fail at rates far in excess of the established EAC standards.  One published and peer-reviewed research study conducted in 2005 by independent computer scientists Matt Bishop, Loretta Guarino, David Jefferson, and David Wagner concluded that an electronic voting machine that had been certified by the State of California had failure rates over *10 times greater* than the minimally-acceptable failure standards of MTBF for electronic voting machines.   Looking solely at software failures – which the researchers deemed "more problematic" than hardware failures – the testing revealed failure rates approximately *six and a half times greater* than minimally-acceptable federal standards of MTBF for electronic voting machines.

24.    Indeed, according to Dr. Michael Ian Shamos, a computer scientist at Carnegie Mellon University who has served as a consultant to the Secretary on direct-recording electronic voting machines ("DREs") since 2004, "[v]oting machines are among the least reliable devices on this planet."  *Voting as an Engineering Problem*, Michael Shamos, The Bridge (National Academy of Engineering), vol. 37, no. 2, 2007.  Dr. Shamos cites evidence that approximately 10% of DRE machines fail in some respect during the average 13 hours they are in use on Election Day.

7

25.     The Bishop study asserts that as many as 20% or more of DRE machines fail during a typical election.

26.     Notably, even the EAC standards for mean time between failures – which the Bishop study and Shamos paper demonstrate often are not met – tolerate failure rates of approximately 8% during the course of a 13-hour election day.  In other words, for a machine that meets the federal MTBF standard of 163 hours, there still is an 8% chance that such a machine will fail sometime during a 13-hour election day.

27.     The demonstrated unreliability of DREs has led California to decertify the use of DREs with recertification only under limited conditions, and has led other states, such as Florida, New Mexico, and Iowa, to similarly shift to optically-scanned paper ballot systems.

28.     There currently are six different DREs in use in Pennsylvania:  the Danaher 1242, the Sequoia AVC Advantage, the Premier (formerly Diebold) AccuVote TSx, the ES&S iVotronic, the Sequoia Edge, and the Hart InterCivic eSlate v 4.1.3.

29.     It is overwhelmingly likely that these DREs will experience significant degrees of failure on Election Day – most likely between 10% and 20% – that will impact the ability of citizens to meaningfully exercise their fundamental right to vote.

**B.     DRE Failures Are Especially Problematic Because Virtually All Election Precincts in Pennsylvania Have No More Than Two or Three Machines**

30.     There are approximately 9,329 individual election precincts in Pennsylvania.  The overwhelming majority of these individual precincts have two or at most three DRE machines.

31.     In Philadelphia County, for example, there are 1681 precincts.  Of these 1681 precincts, four precincts have one machine, 1523 have two machines, 144 have three machines, and one has five machines.  In other words, 90.8% of the precincts in Philadelphia County have two machines or less, and 99.4% have three machines or less.

32.     Dr. Daniel P. Lopresti, a computer scientist at Lehigh University, has demonstrated that the juxtaposition of these two basic facts – the fact that DREs have a 10% to 20% failure rate, coupled with the fact that the overwhelming majority of precincts have only two or three machines – means that it is virtually certain that substantial numbers of precincts will have half or more of their machines fail on Election Day.

33.     As Dr. Lopresti's analysis confirms, assuming a conservative breakdown rate of 10%, there is an 18% probability that a precinct with two machines will be operating at 50% of its capacity by the end of Election Day.  Assuming a 20% breakdown rate, there is a 32% probability that a precinct with two machines will be operating at 50% of its capacity by the end of Election Day.

C.     **The Near Certainty of Widespread DRE Failures Will Overwhelm an Already Extremely Taxed Election System**

34.     Because of the unique circumstances of this moment in history, Pennsylvania's election system already is extremely taxed and barely would be able to handle the demands of this presidential election even if there were no DRE failures.

35.      Pennsylvania has added nearly 400,000 newly registered voters to its rolls since the April 22, 2008 primary alone.  Especially when coupled with the intense public interest in this year's presidential election and predictions of extremely high turnout, this unprecedented level of political participation will put severe pressure on the ability of the system to enable voters across the State to cast their votes in an orderly fashion.

36.     Indeed, an alarming number of election precincts exceed (in many cases dramatically) the cap on registered voters per precinct imposed by state law.  Pennsylvania law provides that individual precincts should not exceed 1,200 registered voters.  25 Pa. Stat. Ann. §

9

2702.  Notwithstanding this state-imposed limit, 2,167 of Pennsylvania's 9,329 election precincts (over 23%) exceed 1,200 registered voters.

37.     The fact that Pennsylvania counties are so dramatically out of compliance with the state-imposed maximum number of registered voters per precinct directly impacts the likelihood that Pennsylvania voters will experience long lines when they arrive at their precincts to vote.  The purpose of the 1,200 person maximum is, in substantial part, to ensure that there will be sufficient time during the voting day for each voter to cast his or her votes.  It takes time, after all, for each voter to be processed and to use the machine for the many elections and/or issues on the ballot, and there are only 780 minutes in a 13-hour voting day.  The more voters that are assigned to a precinct, the greater the likelihood that there will be lines.

38.     Moreover, not only do over 23% of Pennsylvania's election precincts exceed the state law cap on number of registered voters, but a substantial number of election precincts violate state law with respect to the maximum number of voters per voting machine.

39.     According to a recent report prepared by the Advancement Project, "The End of the Line?  Preparing for a Surge in Voter Turnout in the November 2008 General Election," the confluence of these forces means that, even assuming that there are no voting machine breakdowns, the margin of error for Pennsylvania voters is, at best exceedingly slim.  Indeed, the Advancement Project report makes the sobering case that, even if every voting machine in every precinct in Pennsylvania is fully operable from 7 a.m. until 8 p.m. on November 4, 2008, many Pennsylvania precincts nonetheless will be overwhelmed by long lines of voters.

40.     The Advancement Project report analyzed the allocation of voting equipment and poll workers in four Pennsylvania counties:  Philadelphia, Allegheny, Berks, and Montgomery.  Pennsylvania law requires that when approving any electronic voting system, the Secretary must

issue a report which "shall specify . . . the number of voters who may reasonably be accommodated by the voting devices."  25 Pa. Stat. Ann. § 3031.5(b).  Any county that adopts one of these approved systems "shall provide the components of such system in a number no less than sufficient to accommodate the voters of that county or municipality in accordance with the minimum capacity standards so prescribed by the secretary."  *Id*.  The Secretary determined that five of the DREs can accommodate up to between 300 and 350 voters and that the remaining DRE can accommodate up to 400 voters on one election day.

41.     The Advancement Project report used three potential turnout estimates – ranging from most to least conservative – to determine whether these four counties have lived up to their statutory obligation to ensure the provision of sufficient numbers of voting machines.

42.     The results are telling.  The Advancement Project report concluded that there will be insufficient numbers of voting machines – and widespread long lines to vote – in all four counties even if not a single voting machine breaks down.  This is due to the fact that all four counties are substantially out of compliance with 25 Pa. Stat. Ann. § 3031.5 even under the most conservative turnout assumptions.

43.     Fanning the flames even further, neither the Secretary nor the counties has taken adequate measures to ensure that poll workers are trained to handle inevitable DRE failures.  Poll workers are critical to the fair and orderly exercise of the franchise on election day.  Pennsylvania law requires that election and poll workers be trained.  County Boards of Election are required to instruct election officers in their duties to the end that elections may be honestly, efficiently, and uniformly conducted.  25 Pa. Stat. Ann. § 2642(g).  Judges and inspectors of elections are not permitted to serve unless they have received adequate instruction in the use of electronic voting machines and have been found qualified to perform their duties in connection

with the machine.  25 Pa. Stat. Ann. § 2684.  Despite these requirements, there are no uniform

standards for training poll workers with respect to DRE failures and most Pennsylvania counties,

including the state's biggest, Philadelphia, do not require poll workers to be regularly trained.

As a result of poll workers' lack of training on DRE failures, when voting machines break, voters

are turned away from the polls or discouraged from voting as a result of extremely long lines.

> **D.    Past Experience Confirms that Pennsylvania Is Not Prepared to Handle Inevitable DRE Failures On Election Day**

44.    Pennsylvania does not have any coordinated technical response plan for

responding to DRE failures on election day.  Secretary Cortés has failed to develop and

disseminate guidelines for responding to DREs' technical failures.  Most, if not all, Pennsylvania

counties have inadequate technical response plans for responding to DRE failures.  Recent

history is instructive.

45.    On April 22, 2008, Pennsylvania held a statewide primary election, which

included the presidential primary contest for both major political parties.

46.    Defendants were well aware in advance of the election of the anticipated number

of new and returning voters and, indeed, accurately predicted the actual voter turnout (a turnout

that greatly exceeded that of the 2004 primary election).

47.    Nonetheless, at polling places throughout the state, voters suffered the

consequences of the basic failure to provide an adequate number of working voting machines to

reasonably accommodate the registered voters in each precinct, resulting in unreasonably long

lines and waiting times to vote.

48.    Two national election protection hotlines (866-MYVOTE1 and 866-OURVOTE)

monitored Pennsylvania's 2008 primary election and received calls from voters throughout the

Commonwealth reporting problems at voting precincts.

49.     All known hotlines monitoring the election process – including the

MYVOTE1/Watch the Vote Project, the OURVOTE Election Protection Coalition, and the

Philadelphia League of Women Voters – reported that voting machine problems, equipment

problems, and the lack of adequate and uniform emergency voting procedures were the primary

sources of voting problems on primary day.  These problems were well documented and widely

reported by the news media.

50.     Based on analysis of the hotline calls and interviews with individual voters and

election monitors, at least fifty different polling places in Pennsylvania experienced at least one

inoperable voting machine during the primary.

51.     In approximately thirty different polling places, all of the voting machines were

nonfunctional for some period of time.

52.     Many voters reported that they were not offered any form of paper emergency

ballot whatsoever.  Many voters were told to wait in increasingly long lines (ranging from forty

to ninety minutes) before being offered a paper emergency ballot.  Many voters from different

polling places reported that they were told to go home and return at a later time.

53.     Moreover, analysis of hotline call data confirms that Pennsylvania counties do not

have the telecommunications capacity necessary on Election Day to handle the total call traffic

from either frustrated and stranded voters nor frustrated and stressed poll workers.

54.     The great majority of reports of serious machine malfunctions and inadequate

emergency ballot procedures came from precincts with high concentrations of poverty and

people of color.  Statewide, the three counties with the largest populations of minority voters are

Philadelphia County, Allegheny County, and Delaware County.  Approximately thirty-five

different polling places in Philadelphia alone experienced one or more inoperable voting

machines, approximately sixteen of which were reported as having all machines inoperable. Approximately ten polling places in Allegheny county experienced one or more inoperable voting machines, approximately nine of which were reported as having all voting machines inoperable.  Approximately seven polling places in Delaware county experienced one or more inoperable voting machines, approximately six of which were reported as having all voting machines inoperable.

55.     The experiences of the individual named Plaintiffs in this action are instructive.

56.     When plaintiff Richard Brown arrived at his precinct on April 22, 2008 to vote in the primary election, all the voting machines were broken.  Mr. Brown waited nearly two hours at the precinct for the voting machines to be repaired or replaced.  During that time, poll workers failed to offer any voter an emergency paper ballot, and 75 to 100 people came to vote but left without casting a ballot.

57.     Plaintiff Genevieve Geis had a similar experience.  When she and her husband arrived at the precinct to vote in the April 2008 primary election, all of the voting machines were broken.  A person known to poll workers yelled at arriving voters, "Go home!  It's broken. Come back later."  Poll workers failed to offer emergency paper ballots to voters.  Ms. Geis was forced to return to the precinct later in the day to cast her vote.

58.     Likewise, when plaintiff Angel Coleman arrived at her precinct to vote in the April 2008 primary election, she could not vote.  One of three voting machines at her precinct was broken.  That broken machine resulted in a long line of voters waiting to use the two operational machines.  Because Ms. Coleman was not offered an emergency paper ballot and because her work schedule did not permit her to wait in a long line, she was forced to leave the precinct without casting a ballot.  She was forced to return to the precinct later in the day to vote.

59.     Each of the plaintiffs witnessed individuals who were effectively disenfranchised by the non-operational voting machines and the lack of access to emergency paper ballots.

60.     Overall, the consistent pattern of calls documenting voting machine problems, equipment problems, and the lack of adequate and uniform emergency voting procedures received by the election protection hotlines reveals that these problems affected a significant number of voters all across Pennsylvania.

61.     The history of problems caused by DRE failures in Pennsylvania is by no means limited to the 2008 primary.  VotersUnite.org, Voter Action, and other election integrity organizations have also documented widespread voting machine failures leading to long lines and lost votes in the 2006 midterm elections in Pennsylvania.  A report entitled "E-Voting Failures in the 2006 Mid-Term Elections" sampled such problems across the country – from telephone hotlines, news items, and other sources – and also focused specifically on Allegheny County in Pennsylvania.  The report found that there were many instances of machine failures causing long lines, including non-working machines at 11 polling places early on election day, twenty units being taken out of service in polling places across the county because of technical failures, and at least 42 machines breaking down at some point during the day.

E.     **The Response of Election Officials to This Impending Crisis Has Been Woefully Inadequate**

(1)  **Local Officials**

62.     In many counties, election officials have shown shocking and willful disregard for voters' fundamental right to vote.  These officials have not adequately prepared plans for responding to DRE failures and other problems that will cause long line at the polls.

63.     For example, Fred Voight, the Deputy Election Commissioner of Philadelphia responds to questions about voter disenfranchisement due to long lines as follows: "Are there

lines?  Of course there are.  Tough.  That's the way it works."  "People are always going to have to wait in line.  I mean, get a life."  When asked if an emergency paper ballot could be used in Philadelphia to alleviate long lines and overstressed polls, Voight stated: "Forget a long line.  A long line is not justification for anything except waiting."

64.     Indeed, Loree Jones, formerly one of the highest ranking officials in the City of Philadelphia – who served as the City's First Deputy Managing Director and Chief of Staff to the Managing Director (2002-2006); as Secretary of External Affairs (2006-2007); and as Managing Director (2007) – confirms candidly that, in elections historically, voting machines regularly break down at precincts throughout Philadelphia.  Ms. Jones further confirms that these machine breakdowns cause long lines and that voters are turned away from the polls.  She believes it is all but inevitable that, absent the prompt provision of emergency paper ballots when 50% of the voting machines in a precinct are non-operational – which is virtually a cost-free measure – these deplorable and avoidable conditions will recur on Election Day.

65.     But the City Commissioners who are in charge of the Philadelphia election have stated that they do not intend to provide emergency paper ballots when machines are inoperable except to the extent mandated by the Secretary's directive, *i.e.*, only if all machines are down.

### (2)  The Secretary's Directive

66.     On August 26, 2008, a group of organizations, including civil rights and voting rights groups, civic and religious organizations, grassroots, local, statewide, and national organizations, wrote to the Pennsylvania Department of State and requested that the Secretary issue a directive regarding the proper administration of emergency paper ballots.

67.     The letter enclosed a Joint Statement on Emergency Ballots signed by the Pennsylvania chapter of the American Civil Liberties Union, the Black Political Empowerment

16

Project, the Chester County Coalition for Voting Integrity, Common Cause, the Disability Rights Network of Pennsylvania, the Election Reform Network, the League of Women Voters of Pennsylvania, the National Coalition on Black Civic Participation, PA-Verified Voting, the Pennsylvania Council of Churches, Pennsylvania Voice, the Philadelphia Coalition on Black Civic Participation, the Public Interest Law Center of Philadelphia, The Time is Now to Make a Change, the Urban League of Philadelphia, Voter Action, and Women Vote PA.

68.   The organizations requested that the Secretary issue a directive establishing four guidelines:

a.   Emergency paper ballots must be offered to voters as soon as half of the voting machines in a precinct are not functioning.

b.   Emergency paper ballots must be clearly distinguished from provisional and other ballots. Emergency ballots should be marked on the outside as "Emergency Ballots" and "Machines down" or other reason.

c.   Emergency paper ballots must be treated as regular (not provisional) paper ballots. No emergency ballot should be rejected because it is missing any information that may be required of provisional ballots, but is not required of qualified registered voters who had to vote by emergency ballot.

d.   Counties must properly train their poll workers in these procedures.

69.   The organizations explained that these measures were necessary to prevent the widespread divergence in procedures at precincts where voting machines became inoperable during the Pennsylvania primary election, as well as to prevent voters from enduring substantial burdens on their right to vote, in many cases resulting in effective disenfranchisement.

70.     The organizations also explained that the substantial burdens and effective disenfranchisement occurred primarily in areas with higher than average populations of people of color and people living in poverty.

71.     On September 3, 2008, the Secretary issued a "Directive Concerning the Use, Implementation and Operation of Electronic Voting Systems by the County Boards of Elections" (the "Directive").  The Directive fails to address many of the concerns raised by the organizations and falls far short of providing adequate safeguards to Pennsylvania citizens' fundamental right to vote in the event of electronic voting machine failure.

72.     The Directive requires the distribution of "emergency back-up paper ballots" only if *all* electronic voting machines at a polling place are inoperable.

73.     The Directive requiring distribution of emergency paper ballots only when 100% of the voting machines at a polling place are inoperable will, with near certainty, result in unequal access to the right to vote.  As Dr. Lopresti has demonstrated, the constitutional flaw in the 100% rule is that it entirely ignores the probability and negative impact of fewer than all of the machines failing and being out of service at the same time – which, statistically, is far more likely to occur than a simultaneous failure of all machines at once.  In those cases where fewer than all machines fail at once, the 100% rule means that a precinct must function at dramatically lower voting capacity than the Commonwealth or local officials previously deemed appropriate. The 100% rule only provides assistance in the most extreme cases of a catastrophic precinct-wide failure of all machines, but provides no assistance whatsoever in the far more likely circumstance – perhaps a probability of between 18% and 32% for the overwhelming majority of precincts that have two machines – that a breakdown of fewer than all available machines occurs.

**(3)     The Secretary's Memorandum**

74.     In August 2008, Secretary Cortés issued a memorandum on emergency paper ballots ("the Memorandum").

75.     The Memorandum states: "We believe that providing to each election district a number of emergency paper ballots equal to 20% of the number of registered electors in each district is a reasonable formula for determining how many emergency paper ballots to make available on location at each election district."  The Memorandum also states: "there could be an unprecedented turnout in this year's General Election.  Therefore, it would not be prudent to rely solely on historical turnout figures for general elections when calculating the number of emergency paper ballots to distribute."

76.     This Memorandum, recommending that a precinct has sufficient emergency paper ballots for at least 20% of its voters, is not binding on the counties.  Although a directive issued by the Secretary does bind the counties, a memorandum does not.

## INJUNCTIVE AND DECLARATORY RELIEF IS NECESSARY

77.     Plaintiffs have been disenfranchised or otherwise severely burdened in their right to vote as a direct and proximate result of defendants' actions and inactions.

78.     Plaintiffs reasonably anticipate that, absent injunctive relief, they will be disenfranchised or severely burdened in the exercise of their fundamental right to vote in the future, including most critically during the election on November 4, 2008.

79.     There exists an actual and justiciable controversy as to which plaintiffs require a declaration of their rights.

80.     Unless the requested injunctive relief issues, the constitutional rights of plaintiffs (and other eligible voters) will continued to be infringed.

81.     Plaintiffs have no adequate remedy at law for defendants' violations of their rights.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983; Fourteenth Amendment, Equal Protection

82.     Plaintiffs restate as if fully set forth herein each and every claim, assertion, and allegation set forth in Paragraphs 1 through 81 above.

83.     Defendants, acting under color of state law, have maintained and implemented an unequal system of voting that severely burdens and denies equal access to the right to vote, and results in arbitrary and disparate treatment of voters from county to county, precinct to precinct, and ward to ward.

84.     As a result, Pennsylvania citizens eligible and desiring to vote do not have equal access to the franchise.

85.     Defendants, acting under color of state law, have deprived and severely burdened and threaten to deprive and severely burden individual plaintiffs of their fundamental right to vote.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983; Fourteenth Amendment, Due Process

86.     Plaintiffs restate as if fully set forth herein each and every claim, assertion, and allegation set forth in Paragraphs 1 through 85 above.

87.     Defendants, acting under color of state law, have maintained and implemented, and are maintaining and implementing, a system of voting that is fundamentally unfair and that denies and severely burdens the right to vote and that violates substantive Due Process under the Fourteenth Amendment to the United States Constitution.

88.     As a result, many Pennsylvania citizens eligible and desiring to vote do not have access to the franchise.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983; First Amendment**

89.     Plaintiffs restate as if fully set forth herein each and every claim, assertion, and allegation set forth in Paragraphs 1 through 88 above.

90.     Defendants, acting under color of state law, have maintained and implemented, and are maintaining and implementing, a system of voting that is fundamentally unfair and that denies and severely burdens the right to vote and that violates the First Amendment to the United States Constitution.

91.     As a result, many Pennsylvania citizens eligible and desiring to vote will not be able to vote for the candidates of their choice on November 4, 2008.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request the following relief:

1.      A judgment declaring that Pennsylvania's procedures for handling electronic voting machine failure violates Plaintiffs' constitutional rights;

2.      An order preliminarily and permanently enjoining and directing defendants to take the following steps prior to November 4, 2008:

a)      Promulgate, adopt, and enforce a directive requiring poll workers to distribute uniform emergency paper ballots to voters at a precinct whenever 50% or more of the precinct's electronic voting machines are inoperable;

b)      Promulgate, adopt, and enforce a directive to all county officials directing that such officials ensure that, on November 4, 2008, there are available at each voting precinct emergency paper ballots in an amount equal to or greater than 20 percent of the registered voters in that precinct;  and,

c)      Promulgate, adopt, and enforce uniform standards and processes that the Court deems necessary to ensure that all registered voters in a precinct are able to vote without unreasonable delay or hardship on election day.

3.      An order awarding disbursements, costs, and attorneys' fees; and

4.      Such other and further relief that may be just and proper.

Dated:          Philadelphia, Pennsylvania
                October 23, 2008

                                        PUBLIC INTEREST LAW CENTER OF
                                        PHILADELPHIA

                                        125 South 9th Street, Suite 700
                                        Philadelphia PA 19460
                                        (215) 627-7100


                                        By: _____/s/_____
                                            Michael Churchill (MC 8677)


                                        EMERY CELLI BRINCKERHOFF
                                          & ABADY LLP

                                        Jonathan S. Abady* (JA 5147)
                                        Andrew G. Celli, Jr.* (AC 3598)
                                        Ilann Maazel* (IM 5724)
                                        Eric Hecker* (EH 0989)
                                        Elizabeth S. Saylor* (ESS 8091)
                                        Elora Mukherjee* (EM 0921)
                                        Kennisha Austin* (KA 1269)

                                        75 Rockefeller Plaza, 20th Floor
                                        New York, New York 10019
                                        (212) 763-5000

                                        VOTER ACTION

                                        John Bonifaz,* Legal Director (JB 0987)
                                        2366 Eastlake Avenue East, Suite 311
                                        Seattle, Washington 98102
                                        (206) 723-1941

                                        *Attorneys for Plaintiffs*


* Seeking admission *pro hac vice* in the Eastern District of Pennsylvania.

23