UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------------------x

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE STATE CONFERENCE OF
PENNSYLVANIA ("NAACP-SCP"), ELECTION REFORM
NETWORK, RICHARD BROWN, ANGEL COLEMAN,
and GENEVIEVE GEIS,

                      Plaintiffs,                                  08 Civ. _____

          –  against –

PEDRO A. CORTÉS, SECRETARY OF THE
COMMONWEALTH OF PENNSYLVANIA; and
CHET HARHUT, COMMISSIONER, BUREAU OF
COMMISSIONS, ELECTIONS AND LEGISLATION,
PENNSYLVANIA DEPARTMENT OF STATE,

                      Defendants.

---------------------------------------------------------------------------x


### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR PRELIMINARY INJUNCTION


PUBLIC INTEREST LAW CENTER OF PHILADELPHIA
125 South 9th Street, Suite 700
Philadelphia PA 19460

EMERY CELLI BRINCKERHOFF & ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019

VOTER ACTION
2366 Eastlake Avenue East, Suite 311
Seattle, Washington 98102

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (ii-v)

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Electronic Voting Machines That Will Be Used In
          Pennsylvania On Election Day Are Prone To Breakdowns . . . . . . . . . . . . . . . . . 2

    B.    DRE Failures Are Especially Problematic Because Virtually
          All Election Precincts In Pennsylvania Have No More Than
          Two Or Three Machines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The Near Certainty Of Widespread DRE Failures Will
          Overwhelm An Already Extremely Taxed Election System . . . . . . . . . . . . . . . . . 6

    D.    Past Experience Confirms That Pennsylvania Is Not Prepared
          To Handle Inevitable DRE Failures On Election Day . . . . . . . . . . . . . . . . . . . . . . 9

    E.    The Response Of Election Officials To This Impending Crisis
          Has Been Woefully Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          (1)    Local Officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          (2)    The Secretary's Directive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          (3)    The Secretary's Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    Plaintiffs' Claims Are Likely To Succeed On The Merits . . . . . . . . . . . . . . . . . 17

          A.    The Secretary Is Violating The Equal Protection
               Clause Of The Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . 17

          B.    The Secretary Is Violating The Due Process Clause
               Of The Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

          C.    The Secretary Is Violating The First Amendment . . . . . . . . . . . . . . . . . 26

II. Plaintiffs Will Suffer Devastating Harm That Can Be
Remedied Only By An Order Before The Election . . . . . . . . . . . . . . . . . . . . . . . 28

III. The Injunction Would Not Cause Even Greater Harm To
The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV. The Public Interest Would Be Served By The Injunction . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

FEDERAL CASES

*ACLU v. Reno*,
        217 F.3d 162 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Adams v. Freedom Forge Corp.*,
        204 F.3d 475 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Anderson v. Celebrezze,*
        460 U.S. 780 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Bonas v. Town of N. Smithfield,*
        265 F.3d 69 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Buckley v. Am. Constitutional Law Found., Inc.,*
        525 U.S. 182 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bush v. Gore,*
        531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twshp. Sch. Dist.,*
        386 F.3d 514 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 29

*Donohue v. Board of Elections of State of New York*,
        435 F. Supp. 957 (E.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Duncan v. Poythress,*
        515 F.Supp. 327 (D.C.Ga. 1981), *aff'd* 657 F.2d 691 (5th Cir. 1981) . . . . . . . . . . . 20, 24

*Elrod v. Burns,*
        427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Forum for Academic and Institutional Rights ("FAIR") v. Rumsfeld*,
        390 F.3d 219 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Griffin v. Burns,*
        570 F.2d 1065 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Illinois Elections Bd. v. Socialist Workers Party*,
        440 U.S., 173 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*League of Women Voters of Ohio v. Blackwell,*
    432 F.Supp.2d 723 (N.D. Oh. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*League of Women Voters of Ohio v. Blackwell,*
    No. 05-7309, 2006 WL 1580032 (N.D. Ohio Feb. 10, 2006) . . . . . . . . . . . . . . . . . . . . 22

*Lewis v. Kugler,*
    446 F.2d 1343 (3d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Marks v. Stinson,*
    19 F.3d 873 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*McCormick v. Hirsch,*
    460 F. Supp. 1337 (M.D. Pa. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*NAACP v. Alabama,*
    357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Reynolds v. Sims,*
    377 U.S. 533 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rogers v. Corbett,*
    468 F.3d 188 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Strain v. Strackhouse,*
    920 F.2d 1135 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Classic,*
    313 U.S. 299 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Mosley,*
    238 U.S. 383 (1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ury v. Santee,*
    303 F.Supp. 119 (D.C.Ill. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 29

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Williams v. Rhodes,*
    393 U.S. 23 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

STATE STATUTES

25 Pa. Stat. Ann. § 2642(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 Pa. Stat. Ann. § 2684 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 Pa. Stat. Ann. § 2702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

25 Pa. Stat. Ann. § 3031.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Plaintiffs respectfully submit this Memorandum of Law in support of their motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction requiring the Secretary of the Commonwealth Pedro Cortés (the "Secretary") to issue and enforce a directive to the county boards to (1) distribute emergency paper ballots to voters when 50% of voting machines break down in a precinct; and (2) by November 4, 2008, have available emergency paper ballots representing at least 20% of registered voters in each precinct.

## PRELIMINARY STATEMENT

This civil rights action is brought to enforce the most fundamental right secured by the United States Constitution: the right to vote. In Pennsylvania this year, an unprecedented interest in voting, a record number of newly registered voters, and a well-established history of widespread electronic voting machine failures have converged to create a perfect storm that, left unaddressed, unquestionably will result in the disenfranchisement of substantial numbers of citizens. Fortunately, the remedy for this grave threat to the franchise is simple and places only the slightest of burdens on the State: the provision of emergency paper ballots when half or more of the voting machines in any precinct are out of service.

In the face of the extraordinary stresses that our Commonwealth's election apparatus will face this year, the Pennsylvania Secretary's new Directive directing the use of emergency paper ballots only if *all* of the voting machines in a precinct fail is nothing short of perverse. It rests on the specious proposition that remedial action is only required in the most dire of circumstances – no machines working at all – and that no remedy whatsoever is appropriate where, as here, the record demonstrates that thousands of voters will be disenfranchised when 67%, or even 50% of the machines break down.

Although state officials generally have wide discretion to administer elections in the manner they see fit, this is the rare case in which the Secretary is playing with fire to a constitutionally intolerable degree. Given the certainty that electronic voting machines will fail – recognized by the state's own certification expert – and the high degree of likelihood that substantial numbers of precincts across the Commonwealth will suffer multiple failures simultaneously, this court should direct the Secretary to ensure that local election officials provide voters with paper ballots if 50% or more of the voting machines in a precinct become inoperable. This modest intervention would allow all of those who wish to vote the opportunity to do so in a timely way and without undue delay, while imposing only a negligible burden on the Commonwealth and local election officials. In this historic year, with the franchise directly imperiled, surely that is the least we should do.

Secretary Cortés's misguided Directive will cause irreparable harm: to Pennsylvania's voters, to presidential candidates in Pennsylvania, to the overall integrity of Pennsylvania's electoral process, and, given Pennsylvania's vital role in this election, to the integrity of the presidential election itself. Plaintiffs' motion should be granted.

## FACTS

**A.  The Electronic Voting Machines That Will Be Used in Pennsylvania on Election Day Are Prone to Breakdowns**

The fact that electronic voting machines are prone to errors in counting the votes that have been cast is well established and has been widely reported. This case involves a somewhat different but no less troubling issue: the demonstrated tendency of electronic voting machines, including those that will be used in Pennsylvania on Election Day, to break down and cease functioning altogether.

The federal Election Assistance Commission ("EAC") has promulgated performance standards that have been adopted by the Secretary and imposed upon all electronic voting machines used in Pennsylvania. The EAC standards measure machine reliability in terms of "mean time between failures" ("MTBF") – that is, the average interval between system failures or breakdowns. Section 3.4.3 of the EAC's 2002 Voting System Performance and Test Standards require that the MTBF shall be at least 163 hours. Lopresti Decl. ¶¶ 3, 15.

Unfortunately, empirical research has demonstrated that electronic voting machines are prone to break down and fail at rates far in excess of the established EAC standards. One published and peer-reviewed research study conducted in 2005 by independent computer scientists Matt Bishop, Loretta Guarino, David Jefferson, and David Wagner concluded that an electronic voting machine that had been certified by the State of California had failure rates over *10 times greater* than the minimally-acceptable failure standards of MTBF for electronic voting machines. Looking solely at software failures – which the researchers deemed "more problematic" than hardware failures – the testing revealed failure rates approximately *six and a half times greater* than minimally-acceptable federal standards of MTBF for electronic voting machines. The Bishop study asserts that as many as 20% or more of DRE machines fail during a typical election. Lopresti Decl. ¶¶ 13, 15, 17 (discussing "Analysis of Volume Testing of the AccuVote TSx / AccuView," Matt Bishop, Loretta Guarino, David Jefferson, and David Wagner, October 2005, available at http://www.sos.ca.gov/elections/voting_systems/vstaab_volume_test_report.pdf).

Indeed, according to Dr. Michael Ian Shamos, a computer scientist at Carnegie Mellon University who has served as the principal consultant to the Secretary on direct-recording electronic voting machines ("DREs") since 2004, "[v]oting machines are among the least reliable

devices on this planet." *Voting as an Engineering Problem*, Michael Shamos, The Bridge (National Academy of Engineering), vol. 37, no. 2, 2007.  Dr. Shamos – the Commonwealth's own expert – cites evidence that approximately 10% of DRE machines fail in some respect during the average 13 hours they are in use on Election Day.  *Id.*; Lopresti Decl. ¶ 17; Ex. 2.[1]

Notably, even the EAC standards for mean time between failures – which the Bishop study and Shamos paper demonstrate often are not met – tolerate failure rates of approximately 8% during the course of a 13-hour election day.  In other words, for a machine that meets the federal MTBF standard of 163 hours, there still is an 8% chance that such a machine will fail sometime during a 13-hour election day.  Lopresti Decl. ¶ 21.

The demonstrated unreliability of DREs has led California to decertify the use of DREs with recertification only under limited conditions, and has led other states, such as Florida, New Mexico, and Iowa, to similarly shift to optically-scanned paper ballot systems.  *See* California Secretary of State, "Top-to-Bottom Review," available at http://www.sos.ca.gov/elections/elections_vsr.htm.

There currently are six different DREs in use in Pennsylvania:  the Danaher 1242, the Sequoia AVC Advantage, the Premier (formerly Diebold) AccuVote TSx, the ES&S iVotronic, the Sequoia Edge, and the Hart InterCivic eSlate v 4.1.3.  Lopresti Decl. ¶ 21; Ex. 2.

It is overwhelmingly likely that these DREs will experience significant degrees of failure on Election Day – most likely between 10% and 20% – that will impact the ability of citizens meaningfully to exercise their fundamental right to vote.

---

[1]    All exhibit citations herein refer to exhibits attached to the Declaration of Andrew G. Celli, Jr., dated Oct. 22, 2008.

**B.** **DRE Failures Are Especially Problematic Because Virtually All Election Precincts in Pennsylvania Have No More Than Two or Three Machines**

There are approximately 9,329 individual election precincts in Pennsylvania. Singer Decl. ¶ 2. The overwhelming majority of these individual precincts have two or at most three DRE machines. Zisser First Decl. ¶ 4; Exs. 15-22.

In Philadelphia County, for example, there are 1681 precincts. Of these 1681 precincts, four precincts have one machine, 1523 have two machines, 144 have three machines, and one has five machines. In other words, 90.8% of the precincts in Philadelphia County have two machines or less, and 99.4% have three machines or less. Zisser First Decl. ¶ 4; *see also* Ex. 19.

Dr. Daniel P. Lopresti, a computer scientist at Lehigh University, has demonstrated that the juxtaposition of these two basic facts – the fact that DREs have a 10% to 20% failure rate, coupled with the fact that the overwhelming majority of precincts have only two or three machines – means that it is virtually certain that substantial numbers of precincts will have half or more of their machines fail on Election Day. Lopresti Decl. ¶¶ 10, 17-22.

As Dr. Lopresti's analysis confirms, assuming a conservative breakdown rate of 10%, there is an 18% probability that a precinct with two machines will be operating at 50% of its capacity by the end of Election Day. Assuming a 20% breakdown rate, there is a 32% probability that a precinct with two machines will be operating at 50% of its capacity on Election Day. Lopresti Decl. ¶¶ 18-19.

### C. The Near Certainty of Widespread DRE Failures Will Overwhelm an Already Extremely Taxed Election System

Because of the unique circumstances of this moment in history, Pennsylvania's election system already is extremely taxed and barely would be able to handle the demands of this presidential election even if there were no DRE failures.

Pennsylvania has added nearly 400,000 newly registered voters to its rolls since the April 22, 2008 primary alone. Ex. 25. Especially when coupled with the intense public interest in this year's presidential election and predictions of extremely high turnout, this unprecedented level of political participation will put severe pressure on the ability of the system to enable voters across the Commonwealth to cast their votes in an orderly fashion.

Indeed, an alarming number of election precincts exceed (in many cases dramatically) the cap on registered voters per precinct imposed by state law. Pennsylvania law provides that individual precincts should not exceed 1,200 registered voters. 25 Pa. Stat. Ann. § 2702. Notwithstanding this state-imposed limit, 2,167 of Pennsylvania's 9,329 election precincts (over 23%) exceed 1,200 registered voters. Singer Decl. ¶ 3.

The fact that Pennsylvania counties are so dramatically out of compliance with the state-imposed maximum number of registered voters per precinct directly impacts the likelihood that Pennsylvania voters will experience long lines when they arrive at their precincts to vote. The purpose of the 1,200 person maximum is, in substantial part, to ensure that there will be sufficient time during the voting day for each voter to cast his or her votes. It takes time, after all, for each voter to be processed and to use the machine for the many elections and/or issues on the ballot, and there are only 780 minutes in a 13-hour voting day. The more voters that are assigned to a precinct, the greater the likelihood that there will be lines.

Moreover, not only do over 23% of Pennsylvania's election precincts exceed the state law cap on number of registered voters, but a substantial number of election precincts violate state law with respect to the maximum number of voters per voting machine.

According to a recent report prepared by the Advancement Project, "The End of the Line?  Preparing for a Surge in Voter Turnout in the November 2008 General Election," the confluence of these forces means that, even assuming that there are no voting machine breakdowns, the margin of error for Pennsylvania voters is, at best exceedingly slim.  Ex. 4. Indeed, the Advancement Project report makes the sobering case that, even if every voting machine in every precinct in Pennsylvania is fully operable from 7 a.m. until 8 p.m. on November 4, 2008, many Pennsylvania precincts nonetheless will be overwhelmed by long lines of voters.  Ex. 4 at 16-17; Arroya-Mendoza Decl. ¶¶ 2-8.

The Advancement Project report analyzed the allocation of voting equipment and poll workers in four Pennsylvania counties:  Philadelphia, Allegheny, Berks, and Montgomery. Ex. 4 at 16-18.  Pennsylvania law requires that when approving any electronic voting system, the Secretary must issue a report which "shall specify . . . the number of voters who may reasonably be accommodated by the voting devices."  25 Pa. Stat. Ann. § 3031.5(b).  Any county that adopts one of these approved systems "shall provide the components of such system in a number no less than sufficient to accommodate the voters of that county or municipality in accordance with the minimum capacity standards so prescribed by the secretary."  *Id*.  The Secretary determined that five of the DREs can accommodate up to between 300 and 350 voters and that the remaining DRE can accommodate up to 400 voters on one election day.  The Advancement Project report used three potential turnout estimates – ranging from most to least conservative – to determine

whether these four counties have lived up to their statutory obligation to ensure the provision of sufficient numbers of voting machines. Ex. 4 at 3 & Appendix.

The results are telling. The Advancement Project report concluded that there will be insufficient numbers of voting machines – and widespread long lines to vote – in all four counties even if not a single voting machine breaks down. This is due to the fact that all four counties are substantially out of compliance with 25 Pa. Stat. Ann. § 3031.5 even under the most conservative turnout assumptions. Ex. 4 at 16-18; Arroya-Mendoza Decl. ¶ 2-8.

Fanning the flames even further, neither the Secretary nor the counties has taken adequate measures to ensure that poll workers are trained to handle inevitable DRE failures. Poll workers are critical to the fair and orderly exercise of the franchise on election day. Pennsylvania law requires that election and poll workers be trained. County Boards of Election are required to instruct election officers in their duties to the end that elections may be honestly, efficiently, and uniformly conducted. 25 Pa. Stat. Ann. § 2642(g). Judges and inspectors of elections are not permitted to serve unless they have received adequate instruction in the use of electronic voting machines and have been found qualified to perform their duties in connection with the machine. 25 Pa. Stat. Ann. § 2684. Despite these requirements, there are no uniform standards for training poll workers with respect to DRE failures and most Pennsylvania counties, including the state's biggest, Philadelphia, do not require poll workers to be regularly trained. As a result of poll workers' lack of training on DRE failures, when voting machines break, voters are turned away from the polls or discouraged from voting as a result of extremely long lines.

**D.**    **Past Experience Confirms that Pennsylvania Is Not Prepared to Handle Inevitable DRE Failures On Election Day**

Pennsylvania does not have any coordinated technical response plan for responding to DRE failures on Election Day. Secretary Cortés has failed to develop and disseminate guidelines for responding to DREs' technical failures. Most, if not all, Pennsylvania counties have inadequate technical response plans for responding to DRE failures. Recent history is instructive.

On April 22, 2008, Pennsylvania held a statewide primary election, which included the presidential primary contest for both major political parties. Defendants were well aware in advance of the election of the anticipated number of new and returning voters and, indeed, accurately predicted the actual voter turnout (a turnout that greatly exceeded that of the 2004 primary election). Nonetheless, at polling places throughout the state, voters suffered the consequences of the basic failure to provide an adequate number of working voting machines to reasonably accommodate the registered voters in each precinct, resulting in unreasonably long lines and waiting times to vote. Ex. 14, at 1-2; Ex. 13, at 2-3; Jones Decl. ¶¶ 7-10; Cook Decl. ¶¶ 9-10, 12; Gideon Decl. ¶¶ 3-9; Brown Decl. ¶¶ 3-18; Coleman Decl. ¶¶ 6-14; Geis Decl. ¶¶ 2-9; Dorn Decl. ¶¶ 3-11.

Two national election protection hotlines (866-MYVOTE1 and 866-OURVOTE) monitored Pennsylvania's 2008 primary election and received calls from voters throughout the Commonwealth reporting problems at voting precincts. All known hotlines monitoring the election process – including the MYVOTE1/Watch the Vote Project, the OURVOTE Election Protection Coalition, and the Philadelphia League of Women Voters – reported that voting machine problems, equipment problems, and the lack of adequate and uniform emergency voting

procedures were the primary sources of voting problems on primary day. Cook Decl. ¶¶ 9-10, 12; Gideon Decl. ¶¶ 3-9; Ex. 13 at 2-3. These problems were well documented and widely reported by the news media. *Id.*

Based on analysis of the hotline calls and interviews with individual voters and election monitors, at least fifty different polling places in Pennsylvania experienced at least one inoperable voting machine during the primary. Ex. 14 at 1-2; Ex. 13. In approximately thirty different polling places, all of the voting machines were nonfunctional for some period of time. *Id.*

Many voters reported that they were not offered any form of paper emergency ballot whatsoever. Many voters were told to wait in increasingly long lines (ranging from forty to ninety minutes) before being offered a paper emergency ballot. Many voters from different polling places reported that they were told to go home and return at a later time. Cook Decl. ¶ 12; Brown Decl. ¶¶ 5-18; Coleman Decl. ¶¶ 6-14; Geis Decl. ¶¶ 3-9; Dorn Decl. ¶¶ 3-11; Jones Decl. ¶ 7; Ex. 13 at 2-3.

Moreover, analysis of hotline call data confirms that Pennsylvania counties do not have the telecommunications capacity necessary on Election Day to handle the total call traffic from either frustrated and stranded voters nor frustrated and stressed poll workers. Cook Decl. ¶ 8, 15.

The great majority of reports of serious machine malfunctions and inadequate emergency ballot procedures came from precincts with high concentrations of poverty and people of color. Statewide, the three counties with the largest populations of minority voters are Philadelphia County, Allegheny County, and Delaware County. Approximately thirty-five different polling places in Philadelphia alone experienced one or more inoperable voting

machines, approximately sixteen of which were reported as having all machines inoperable. Approximately ten polling places in Allegheny County experienced one or more inoperable voting machines, approximately nine of which were reported as having all voting machines inoperable. Approximately seven polling places in Delaware County experienced one or more inoperable voting machines, approximately six of which were reported as having all voting machines inoperable. Ex. 14 at 1-2.

The experiences of the individual named Plaintiffs in this action are instructive. Just six months ago, during the April 2008 primary, the Plaintiffs and other voters faced lines at the polling sites up to two hours long as a result of non-operational machines, voters leaving the precincts in frustration, and poll workers directing voters to "[c]ome back later" and failing to offer any emergency paper ballots. These experiences attest to the confusion and disenfranchisement which promises to recur on Election Day. *See generally* Brown Decl.; Coleman Decl.; Geis Decl.; Dorn Decl.; Jones Decl. ¶¶ 7-10.

Overall, the consistent pattern of calls documenting voting machine problems, equipment problems, and the lack of adequate and uniform emergency voting procedures received by the election protection hotlines reveals that these problems affected a significant number of voters all across Pennsylvania. *See, e.g.*, Ex. 14.

The history of problems caused by DRE failures in Pennsylvania is by no means limited to the 2008 primary. Jones Decl. ¶¶ 7-9. VotersUnite.org, Voter Action, and other election integrity organizations have also documented widespread voting machine failures leading to long lines and lost votes in the 2006 midterm elections in Pennsylvania. A report entitled "E-Voting Failures in the 2006 Mid-Term Elections" sampled such problems across the country – from telephone hotlines, news items, and other sources – and also focused specifically

on Allegheny County in Pennsylvania. Ex. 5. The report found that there were many instances of machine failures causing long lines, including non-working machines at 11 polling places early on primary day, twenty units being taken out of service in polling places across the county because of technical failures, and at least 42 machines breaking down at some point during the day. Gideon Decl. ¶¶ 10-14; Ex. 5.

### E. The Response of Election Officials to This Impending Crisis Has Been Woefully Inadequate

#### (1) Local Officials

In many counties, election officials have shown shocking and willful disregard for voters' fundamental right to vote. These officials have not adequately prepared plans for responding to DRE failures and other problems that will cause long line at the polls.

For example, Fred Voight, the Deputy Election Commissioner of Philadelphia responds to questions about voter disenfranchisement due to long lines as follows: "Are there lines? Of course there are. Tough. That's the way it works." "People are always going to have to wait in line. I mean, get a life." When asked if an emergency paper ballot could be used in Philadelphia to alleviate long lines and overstressed polls, Voight stated: "Forget a long line. A long line is not justification for anything except waiting." *See* "Philly Official Scoffs at Voting Problems," available at www.americannewsproject.com/videos/155.

Indeed, Loree Jones, formerly one of the highest ranking officials in the City of Philadelphia – who served as the City's First Deputy Managing Director and Chief of Staff to the Managing Director (2002-2006); as Secretary of External Affairs (2006-2007); and as Managing Director (2007) – confirms candidly that, in elections historically, voting machines regularly break down at precincts throughout Philadelphia. Jones Decl. ¶ 7. Ms. Jones further confirms

that these machine breakdowns cause long lines and that voters are turned away from the polls. *Id.* She believes it is all but inevitable that, absent the prompt provision of emergency paper ballots when 50% of the voting machines in a precinct are non-operational – which is virtually a cost-free measure – these deplorable and avoidable conditions will recur on Election Day. *Id.* at ¶¶ 8-10.

But the City Commissioners who are in charge of the Philadelphia election have stated that they do not intend to provide emergency paper ballots when machines are inoperable except to the extent mandated by the Secretary's directive, *i.e.*, only if all machines are down. Zissner Second Decl. ¶¶ 2-4.

### (2) The Secretary's Directive

On August 26, 2008, a group of organizations, including civil rights and voting rights groups, civic and religious organizations, grassroots, local, statewide, and national organizations, wrote to the Pennsylvania Department of State and requested that the Secretary issue a directive regarding the proper administration of emergency paper ballots. Ex. 23.

The letter enclosed a Joint Statement on Emergency Ballots signed by the Pennsylvania chapter of the American Civil Liberties Union, the Black Political Empowerment Project, the Chester County Coalition for Voting Integrity, Common Cause, the Disability Rights Network of Pennsylvania, the Election Reform Network, the League of Women Voters of Pennsylvania, the National Coalition on Black Civic Participation, PA-Verified Voting, the Pennsylvania Council of Churches, Pennsylvania Voice, the Philadelphia Coalition on Black Civic Participation, the Public Interest Law Center of Philadelphia, The Time is Now to Make a Change, the Urban League of Philadelphia, Voter Action, and Women Vote PA. *Id.*

The organizations requested that the Secretary issue a directive establishing four guidelines:

a.      Emergency paper ballots must be offered to voters as soon as half of the voting machines in a precinct are not functioning.

b.      Emergency paper ballots must be clearly distinguished from provisional and other ballots.  Emergency ballots should be marked on the outside as "Emergency Ballots" and "Machines down" or other reason.

c.      Emergency paper ballots must be treated as regular (not provisional) paper ballots.  No emergency ballot should be rejected because it is missing any information that may be required of provisional ballots, but is not required of qualified registered voters who had to vote by emergency ballot.

d.      Counties must properly train their poll workers in these procedures.  *Id.* at 1.

The organizations explained that these measures were necessary to prevent the widespread divergence in procedures at precincts where voting machines became inoperable during the Pennsylvania primary election, as well as to prevent voters from enduring substantial burdens on their right to vote, in many cases resulting in effective disenfranchisement.  The organizations also explained that the substantial burdens and effective disenfranchisement occurred primarily in areas with higher than average populations of people of color and people living in poverty.  *Id.*

On September 3, 2008, the Secretary issued a "Directive Concerning the Use, Implementation and Operation of Electronic Voting Systems by the County Boards of Elections" (the "Directive").  Ex. 24.  The Directive fails to address many of the concerns raised by the

organizations and falls far short of providing adequate safeguards to Pennsylvania citizens'
fundamental right to vote in the event of electronic voting machine failure.

The Directive requires the distribution of "emergency back-up paper ballots" only
if *all* electronic voting machines at a polling place are inoperable.  Further, the Directive only
permits the use of emergency back-up paper ballots until any machine is repaired or replaced,
regardless of the condition of the remainder of the machines at the precinct.  *Id.*

The Directive requiring the distribution of emergency paper ballots only when
100% of the voting machines at a polling place are inoperable will, with near certainty, result in
unequal access to the right to vote.  As Dr. Lopresti has demonstrated, the constitutional flaw in
the 100% rule is that it entirely ignores the probability and negative impact of fewer than all of
the machines failing and being out of service at the same time – which, statistically, is far more
likely to occur than a simultaneous failure of all machines at once.  Lopresti Decl. ¶ 12.  In those
cases where fewer than all machines fail at once, the 100% rule means that a precinct must
function at dramatically lower voting capacity than the Commonwealth or local officials
previously deemed appropriate.  The 100% rule only provides assistance in the most extreme
cases of a catastrophic precinct-wide failure of all machines, but provides no assistance
whatsoever in the far more likely circumstance – perhaps a probability of between 18% and 32%
for the overwhelming majority of precincts that have two machines – that a breakdown of fewer
than all available machines occurs.  Lopresti Decl. ¶¶ 12-13, 18-20.

### (3) The Secretary's Memorandum

In August 2008, Secretary Cortés issued a memorandum on emergency paper
ballots ("the Memorandum").  Ex. 26.  The Memorandum states: "We believe that providing to
each election district a number of emergency paper ballots equal to 20% of the number of

registered electors in each district is a reasonable formula for determining how many emergency paper ballots to make available on location at each election district." *Id*. The Memorandum also states: "there could be an unprecedented turnout in this year's General Election. *Id*. Therefore, it would not be prudent to rely solely on historical turnout figures for general elections when calculating the number of emergency paper ballots to distribute." *Id.*

This Memorandum, recommending that a precinct has sufficient emergency paper ballots for at least 20% of its voters, is not binding on the counties. Although a directive issued by the Secretary does bind the counties, a memorandum does not.

## ARGUMENT

### THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

In ruling on this preliminary injunction motion, the Court must consider four factors: (1) whether plaintiffs have a strong likelihood of success on the merits; (2) whether plaintiffs would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would result in an even greater harm to the nonmoving party; and (4) whether the public interest would be served by issuance of the injunction. *Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twshp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004) (Alito, J.) (affirming grant of preliminary injunction and remanding for entry of permanent injunctive relief); *Cooper v. City of Philadelphia, 18th Dist.*, No. 93-3007, 1993 WL 274192, at *1 (E.D.Pa. July 2, 1993).

Because plaintiffs have a clear and substantial likelihood of prevailing on the merits and because the failure to modify the Directive would violate plaintiffs' constitutional rights and cause irreparable harm, this Court should issue a preliminary injunction ordering the

Secretary to order election officials statewide to (1) provide paper ballots to voters when 50% or more of the machines in a precinct are out of service, and (2) have available paper ballots equal to 20% of registered voters in the precinct.

I.    **PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS**

To prevail on their 42 U.S.C. § 1983 claims, plaintiffs must demonstrate that the Secretary (1) acted under color of state law; and (2) deprived plaintiffs of a federal right, either statutory or constitutional. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1141-42 (3d Cir. 1990). Here, there is no dispute that Secretary Cortés has at all times relevant to this case acted "under color" of Pennsylvania law. Nor can there be much dispute that the Secretary's failure to ensure the right to vote violates plaintiffs' federal constitutional rights.

A.    **The Secretary is Violating the Equal Protection Clause of the Fourteenth Amendment**

Secretary Cortés's Directive and Memorandum violate plaintiffs' constitutional right to vote. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting" is a "fundamental political right, because [it is] preservative of all rights."). "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, . . . and to have their votes counted." *Reynolds*, 377 U.S. at 554 (collecting cases). "Obviously included within the right to choose, secured by the

Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . ." *United States v. Classic*, 313 U.S. 299, 315 (1941).

The Supreme Court has time and again upheld these core principles: "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Id*.

In election cases, the Third Circuit Court of Appeals described the constitutional test as follows: "[u]ltimately, [the Court's] scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs' rights be burdened. Only after weighing these factors can we decide whether the challenged [action] is unconstitutional." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006).

Here, the burdens placed on plaintiffs' rights are immense. First, the right itself is *the* most "fundamental political right," because it is "preservative of all rights." *Yick Wo*, 118 U.S. at 370. And as demonstrated *supra*, there is a very substantial danger, in fact a virtual certainty, that thousands of voters will lose their right to vote because of defendants' failure to order a modest remedial measure. In the 2008 primary, hundreds of voters were turned away from the polls, or gave up after waiting hour after hour on line for a chance to vote—all problems that could have been avoided had the Commonwealth effectively addressed the inevitable issue of machine breakdown.

The Court must balance this terrible burden upon the most precious right in a democracy—the right to vote—against an as-yet undefined state interest. Surely the Commonwealth has no interest in denying the franchise. What, then, is the state interest?

Viewed against the extremely modest and tailored relief plaintiffs seek, it is difficult to imagine any non-minimal state interest. Plaintiffs seek two pieces of discrete relief. First, under the Directive, poll workers are not directed to distribute emergency paper ballots unless *none* of the electronic voting machines in a precinct is operable. This Directive does nothing to address the massive problems at the polls that will occur, and that *have* occurred, when 67% of the machines do not work, or 50%. Plaintiffs request that the Court modify the Directive, so that if **50%** or more of electronic voting machines in a precinct are inoperable, poll workers must distribute emergency paper ballots. Though the change is costless and simple to implement, it is significant. As set forth *supra*, the evidence suggests there is an 18-32% possibility that a precinct with two machines (which includes 90% of precincts in Philadelphia County alone) will operate at 50% capacity. We also know that where precincts are at 50% capacity (or even at 67% capacity), there will be chaos at the polls, prohibitively long lines, and thousands of disenfranchised voters on Election Day. This was true in the 2008 primary, and it will be even more true on Election Day, given the 400,000 newly registered voters, the unprecedented interest in this election, the already-insufficient number of voting machines, and the predictions of extremely high turnout. By the State's own admission, and given that so many precincts *already* have more registered voters per machine than are permitted under Pennsylvania law, a 50% failure rate at a polling place will mean chaos and an inability to process voters whom (even in normal circumstances) the Commonwealth expects to vote.

Why, then, *wouldn't* the Commonwealth direct that paper ballots be distributed to voters if 50% or more of the machines break down?  Each precinct is already required to have paper ballots on hand, and to use them if *all* the machines break down.  Requiring the distribution of emergency paper ballots in the 50% breakdown scenario is a minimal burden indeed.

Plaintiffs' second request for relief also implicates no significant state interest. Under the Memorandum, precincts *may* order a number of paper ballots equal to 20% of registered voters in the precinct.  This elective Memorandum is an invitation to disaster.  No precinct can predict with certainty which machines, or how many machines, will break down.  If 50% of machines break down in two different precincts, but the first precinct ordered paper ballots for 30% of registered voters and the second for only 5%, there will be enough ballots in the first precinct for voters, but not in the second.  Why should the right to vote depend upon the varying, arbitrary decisions made at hundreds of different precincts?

Accordingly, plaintiffs' second request for relief is modest and straightforward: make the elective Memorandum mandatory and therefore uniform (instead of completely arbitrary).  This relief poses only a minimal burden on the Commonwealth: the cost of copying and distributing a few more paper ballots.  The Memorandum already *advises* that each precinct secure ballots for 20% of registered voters; making the Memorandum mandatory could hardly be a significant burden.  In any event, the idea that an American citizen's right to vote for President will be lost because of the modest printing cost of a few more ballots is not only intolerable; it is embarrassing to American democracy.  *See*, *e.g.*, *Duncan v. Poythress*, 515 F.Supp. 327, 342 (D.C.Ga. 1981), *aff'd* 657 F.2d 691, 708 (5th Cir. 1981) ("The cost to the state of *holding [a new] election* certainly is, or should be, a matter of concern for all citizens of this state;

nevertheless, it is *not* a sufficiently compelling reason to deny plaintiffs the relief they seek. The restoration of the plaintiffs' right to vote outweighs the public expenditure involved.") (emphasis added).

Plaintiffs' request for relief is quite modest compared to the relief ordered by courts in prior similar cases. The case most on point is *Ury v. Santee*, 303 F.Supp. 119 (D.C.Ill. 1969). There, voters were "forced to wait unreasonable lengths of time to obtain and cast their ballots in certain of the precincts . . . as a result of the consolidation of 32 precincts into six precincts, because of the assignment of excessive numbers of registered voters to the precincts, the establishment of inadequate voting facilities and the failure to provide sufficient numbers of judges to service such polling places." Voters were "[i]n many instances . . . required to wait for periods of two to four hours to cast their ballots." As a result of defendants' actions (consolidating 32 precincts into six precincts and the assignment of excessive numbers of voters to a single precinct), "hundreds of voters were effectively deprived of their right to vote" in the election. *Id.* at 124.

Because of these two to four hour waits, which led to the disenfranchisement of "hundreds" of voters, the court concluded that the Village violated plaintiffs' right to vote, and nullified the entire election. "It was the duty of defendants as the responsible officers and trustees of the Village of Wilmette to provide adequate and substantially equal voting facilities to the citizens of Wilmette. . . . As a consequence of the failure of defendants to provide adequate voting facilities, plaintiffs and those similarly situated were hindered, delayed and effectively deprived of their rights secured by the Constitution of the United States to vote in the April 15, 1969 election." *Id.* at 126. The Court held that "United States citizens . . . have a right guaranteed by the Constitution to a reasonable opportunity to vote in local elections, that is, to be

given reasonable access to the voting place." *Id.* Having caused unreasonably long lines through actions that could have been prevented, the Village denied voters that right and, as a result, the Court declared the entire election "invalid, null, void and of no effect," and ordered a new general election "at the earliest possible date." *Id.* at 127.

The Secretary's actions here are, if anything, far more problematic than in *Ury*. Here, potentially *thousands* of voters may be disenfranchised. Lines could well be much *longer* than two to four hours. And the electoral stakes could not be higher: no less than the nation's highest office is at stake. *Cf. Donohue v. Board of Elections of State of New York*, 435 F. Supp. 957, 968 (E.D.N.Y. 1976) ("The fact that a national election might require judicial intervention, concomitantly implicating the interests of the entire nation, if anything, militates in favor of interpreting the equity jurisdiction of the federal courts to include challenges to Presidential elections.").

In *Ury*, the Court waited until after the election to nullify the election. That would be a disastrous result here. One need only recall the chaos and confusion of the 2000 fiasco in Florida to understand the importance of securing the vote *prior* to the election, not after.

Perhaps recognizing that post-election relief can be unworkable, a district court recently held that plaintiffs similarly situated to those here are entitled to pursue prospective injunctive relief "to prevent a repeat of . . . systemic breakdowns of the voting process." *League of Women Voters of Ohio v. Blackwell*, 432 F.Supp.2d 723, 726 (N.D. Oh. 2005).[2] In *Blackwell*, the plaintiffs alleged that Ohio's election system violates the Constitution's equal protection guarantees because voters effectively had unequal access to the polls. Plaintiffs alleged that, as a

---

[2] The opinion has been certified for appeal. *See League of Women Voters of Ohio v. Blackwell*, No. 05-7309, 2006 WL 1580032 (N.D. Ohio Feb. 10, 2006) (certifying issues for interlocutory appeal).

result of the conduct of Ohio's governor and secretary of state, "[s]ome citizens get short lines, properly functioning voting machines, well trained and informed poll workers, accurate registration information, and the opportunity to cast unencumbered absentee or proper provisional ballots.  Other citizens, due to the vagaries of residence and registration, encounter long lines, defective voting machines, ill-trained and uniformed poll workers, inaccurate registration information, and absentee or provisional ballots that are ultimately deemed invalid." *Id.* at 727.

The *Blackwell* defendants claimed that plaintiffs could not, as a matter of law, pursue prospective injunctive relief for these systemic problems, but rather should be limited to "seek[ing] redress . . . with the local [board of elections]" for their "specific problem[]."  *Id.* at 728.  The Court disagreed: "[State] [i]naction that diminishes the right to vote equally may be . . . actionable. . . . A state's failure to exercise [its] power, where such inaction foreseeably impairs the fair and equal exercise of the franchise, gives rise to an equal protection claim."  *Id.*

This case is much more straightforward than *Blackwell*.  Here, plaintiffs do not seek wholesale prospective reform.  Instead, plaintiffs seek two extremely modest and tailored directives to prevent the disenfranchisement of thousands of voters: (1) a directive that if 50% or more of electronic voting machines in a precinct are inoperable, poll workers must distribute emergency paper ballots; and (2) a directive requiring precincts to have paper ballots equal to 20% of registered voters in the precinct.  Failure to make these modest changes will likely lead to disenfranchisement of thousands of voters, an intolerable result in a democracy.

Plaintiffs' motion for a preliminary injunction should be granted.

## B. The Secretary is Violating the Due Process Clause of the Fourteenth Amendment

The Secretary's Directive and Memorandum also violate the Substantive Due Process Clause of the Fourteenth Amendment. Under the Constitution, citizens have a fundamental right to vote and to have their vote counted by way of election procedures that are fundamentally fair. *United States v. Mosley*, 238 U.S. 383, 386 (1915); *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978). The touchstone of Due Process Clause analysis is "fundamental fairness"—the idea that the state official cannot conduct an election in a manner so flawed as to amount to a denial of voters' rights to have their voices heard and their votes count. The Court cannot countenance the Secretary's failure (in the face of overwhelming evidence) to deal with the disenfranchisement caused by machine breakdown.

Where "organic failures in a state or local election process threaten to work patent and fundamental unfairness, a . . . claim lies for a violation of substantive due process." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *see also Marks v. Stinson*, 19 F.3d 873, 888 (3d Cir. 1994) (substantive due process violation exists where there is a "broad-gauged unfairness" that infects the results of an election); *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981) ("the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process"); *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order"); *Siegel v. LePore*, 234 F.3d 1163, 1187 (11th Cir. 2000) (a federally protected right is implicated "where the entire election process including — as part

thereof the state's administrative and judicial corrective process — fails on its face to afford

fundamental fairness") (citations omitted).

In the seminal case *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), the First

Circuit explained when federal courts would act to prevent a violation of due process in the

context of election irregularities:

> [Federal courts have properly intervened when] the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed. Due process, '(r)epresenting a profound attitude of fairness between man and man, and more particularly between individual and government,' . . . is implicated in such a situation. . . . In cases falling within such confines, we think that a federal judge need not be timid, but may and should do what common sense and justice require.

*Griffin*, 570 F.2d at 1078 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123

(1951) (Frankfurter, J., concurring)).

The Directive and Memorandum are similarly fundamentally flawed. It is absurd

that some precincts may have enough ballots to vote, while others will not. It is absurd that

voters may have to wait two or three (or more) hours to vote because 50%, or 67%, of the

machines in a precinct failed and the precinct refused to distribute paper ballots. It is absurd that

the Commonwealth would knowingly permit *any* chance of disenfranchising voters because it

refused to take the simplest of measures to protect the vote. It is absurd, and it is

unconstitutional. *See supra*.

The Due Process Clause protects against arbitrary conduct likely to deny the

franchise. Here there are simple, and largely costless, measures that can be taken to minimize

the likelihood that voters will be effectively turned away out the polls. Plaintiffs' modest request for relief should be granted.

### C.    The Secretary is Violating the First Amendment

The Secretary's Directive and Memorandum also violate plaintiffs' First Amendment rights to freedom of speech and association. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Elsewhere, the Supreme Court has observed, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters . . . to cast their votes effectively . . . rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). This right to have a voice in the election and to cast votes effectively is rooted not only in the Fourteenth Amendment; it is also rooted in the First Amendment. *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) (it is "beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech").

In an election, "voters can assert their preferences only through candidates or parties or both." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). Thus, this First Amendment right is "heavily burdened" where the voters' candidate of choice is not on the ballot. *Id.* Ballot-access cases are therefore typically analyzed through a First Amendment lens. *See*, *e.g.*, *id.*; *Illinois Elections Bd. v. Socialist Workers Party,* 440 U.S., 173, 186 (1979) ("an election campaign is a means of disseminating ideas as well as attaining political office . . . . Overbroad restrictions on ballot access jeopardize this form of political expression"); *see also*

*Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999) (striking down various restrictions on gathering of initiative petitions). "The exclusion of candidates [from the ballot] burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Anderson*, 460 U.S. at 787-88.

Just as excluding candidates from the ballot "burdens voters' freedom of association," *id.*, so too does the exclusion of actual votes *for* a candidate. Just as "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot," *Williams*, 393 U.S. at 31, the right of a party or candidate to be *on* the ballot means little if voters cannot vote for that party or candidate. In the former case, the voter cannot associate with the candidate because the candidate is not on the ballot. In the latter, the voter cannot associate with the candidate because the voter cannot get to the ballot box. In both cases, the voter's right to associate with a candidate is not only "burdened," but eviscerated.

Where, as here, the First Amendment rights of voters and candidates "are at stake," the Secretary "must establish" that the state's actions are "necessary to serve a compelling interest." *Illinois Elections Bd.,* 440 U.S. at 184. But when some of the machines break down, no compelling interest is served by forcing voters to stand for two to three (or more) hours, when precincts could easily let voters vote by paper ballot. No compelling interest is served by running out of paper ballots in a precinct. No compelling interest is served by making voting a crapshoot, dependent upon the vagaries of machine breakdown and the local decisions of hundreds of precincts, some which ordered sufficient paper ballots and others which did not.

"[T]he right of qualified voters . . . to cast their votes effectively . . . rank[s] among our most precious freedoms." *Williams*, 393 U.S. at 30. Secretary Cortés should be

enjoined to make paper ballots available as set forth above so that *all* voters, not just those lucky enough to be in a precinct where the machines do not break down, are ensured the right to vote.

## II. PLAINTIFFS WILL SUFFER DEVASTATING HARM THAT CAN BE REMEDIED ONLY BY AN ORDER BEFORE THE ELECTION

Because plaintiffs have demonstrated a likelihood of success on the merits, the Court's inquiry is effectively at an end. Where constitutional rights are concerned, a successful showing of likelihood of success on the merits mandates a finding of irreparable harm. *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Forum for Academic and Institutional Rights ("FAIR") v. Rumsfeld*, 390 F.3d 219, 246 (3d Cir. 2004) ("By establishing a likelihood of success on the merits of its unconstitutional claim . . . [plaintiff] has necessarily satisfied the second element: irreparable harm."), *rev'd on other grounds*, 547 U.S. 47 (2006); *ACLU v. Reno*, 217 F.3d 162, 180 (3d Cir. 2000), *vacated on other grounds*, *Ashcroft v. ACLU*, 535 U.S. 564 (2002); *Lewis v. Kugler*, 446 F.2d 1343, 1350 n.12 (3d Cir. 1971) (deprivation of constitutional rights raises "presumption of irreparable harm"); *McCormick v. Hirsch*, 460 F. Supp. 1337, 1349 (M.D. Pa. 1978).

Even without such a presumption, plaintiffs have shown that they will suffer irreparable harm absent immediate court intervention. "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). No monetary damages, retroactive relief or settlement could make any difference if voters are denied the right to vote. Unless this Court intervenes now, there is a substantial risk that thousands of voter in Pennsylvania will be

deprived access to the ballot box. Nothing the Court does after Election Day (short of demanding a new election, *see, e.g.*, *Ury*, 303 F.Supp. 119) will change that irreparable fact.

### III. THE INJUNCTION WOULD NOT CAUSE EVEN GREATER HARM TO THE DEFENDANTS

Defendants cannot claim any harm resulting from this injunction, let alone "even greater harm" than that suffered by plaintiffs in the absence of the injunction. *Child Evangelism Fellowship*, 386 F.3d at 524. Without an injunction, many voters will be denied the right to vote, which would cause harm to Pennsylvania's voters, to the Presidential candidates, to the integrity of Pennsylvania's electoral process, and, given Pennsylvania's important role in this election, to the integrity of the Presidential election itself. Defendants, "on the other hand, do[] not lose the opportunity, in a proceeding on the merits, to shoulder [their] full constitutional burden of proof of showing that a less restrictive alternative would not be as effective" in safeguarding citizens' access to the franchise. *FAIR*, 390 F.3d at 246. The balance of interests tips overwhelmingly in plaintiffs' favor. *Id.*

### IV. THE PUBLIC INTEREST WOULD BE SERVED BY THE INJUNCTION

There is no question where the public interest lies in this case. The public is not served by any denial of the right to vote. It is served only by fair process that allows *every* voter to vote at the polls on Election Day. The public interest would plainly be served by the injunction.

## CONCLUSION

For all the foregoing reasons, plaintiffs' motion for a preliminary injunction should be granted.

Dated:      Philadelphia, Pennsylvania

October 23, 2008

PUBLIC INTEREST LAW CENTER OF
PHILADELPHIA

125 South 9th Street, Suite 700
Philadelphia PA 19460
(215) 627-7100

By: ___/s/_____
     Michael Churchill (MC 8677)

EMERY CELLI BRINCKERHOFF
  & ABADY LLP

Jonathan S. Abady* (JA 5147)
Andrew G. Celli, Jr.* (AC 3598)
Ilann Maazel* (IM 5724)
Eric Hecker* (EH 0989)
Elizabeth S. Saylor* (ESS 8091)
Elora Mukherjee* (EM 0921)
Kennisha Austin* (KA 1269)

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

VOTER ACTION

John Bonifaz,* Legal Director (JB 0987)

2366 Eastlake Avenue East, Suite 311
Seattle, Washington 98102
(206) 723-1941

*Attorneys for Plaintiffs*

\* Seeking admission *pro hac vice* in the Eastern District of Pennsylvania.