IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONAL ASSOCIATION FOR THE   :   CIVIL ACTION
ADVANCEMENT OF COLORED         :
PEOPLE STATE CONFERENCE OF      :
PENNSYLVANIA, et al.            :
                                :
          v.                    :
                                :
PEDRO A. CORTES, Secretary      :
of the Commonwealth of          :
Pennsylvania, et al.            :   NO. 08-5048

MEMORANDUM

Bartle, C.J.                                    October 29, 2008

          Plaintiffs, the National Association for the
Advancement of Colored People State Conference of Pennsylvania
("NAACP-SCP"),[1] the Election Reform Network, Richard Brown, Angel
Coleman, and Genevieve Geis, filed this action on October 23,
2008 against defendants Pedro A. Cortes, Secretary of the
Commonwealth of Pennsylvania and Chief Elections Officer for
Pennsylvania, and Chet Harhut, Commissioner of the Pennsylvania
Department of State's Bureau of Commissions, Elections, and
Legislation.  Plaintiffs seek preliminary injunctive relief prior
to the November 4 presidential election to require the defendants
to promulgate, adopt and enforce a directive requiring local
election officials in Pennsylvania to distribute emergency paper

_____

1.  NAACP-SCP has 15,000 members in 46 branches across
Pennsylvania.

ballots to eligible voters at any division or precinct[2] whenever 50% or more of the electronic voting machines of a division or precinct are inoperable.[3]

Plaintiffs sue under 42 U.S.C. § 1983.[4]  They maintain that without the requested relief many voters will have their right to vote unduly burdened in violation of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution.  This court held an evidentiary hearing on October 28, 2008, and now makes the following findings of fact and conclusions of law.

---

2.  The Pennsylvania Election Code defines an "election district" to mean a district, division or precinct, established in accordance with the provisions of this act, within which all qualified electors vote at one polling place.  25 Pa. Cons. Stat. § 2602(g).  We shall use the term "precinct" to generally refer to the election districts throughout Pennsylvania.

3.  Plaintiffs have withdrawn their request that the court order defendants to require local election officials to ensure that there are available at each precinct paper ballots in an amount equal to or greater than 20% of the registered voters in that district.

4.  Title 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, ....

I.

On November 4, the voters of Pennsylvania will cast
ballots for electors for President and Vice President of the
United States, and for nineteen representatives in Congress.
They will also vote for the state-wide offices of Attorney
General, Auditor General, and Treasurer as well as for senators
in half the state senatorial districts and all 203
representatives in the Pennsylvania General Assembly.  In
addition, the ballot will contain one state-wide question and in
Philadelphia three additional questions, two dealing with
amendments to the City Charter and one concerning the issuance of
bonds.

Defendant Pedro Cortes, the Secretary of the
Commonwealth of Pennsylvania, is sued in his official capacity
for actions and omissions under color of law.[5]  Secretary Cortes
is the Commonwealth's Chief Election Official responsible for
overseeing Pennsylvania's electoral process.  Among his duties
are the examination and reexamination of voting machines and the
approval or disapproval of them for use in Pennsylvania, the
receipt of information on voting system errors, difficulties or
other election data, and the establishment of a system for the
remedying of complaints regarding the administration of Title III

---

5.  Defendant Chet Harhut, the Commissioner of the Pennsylvania
Department of State's Bureau of Commissions, Elections, and
Legislation, is responsible for the supervision of the Bureau.
He is also sued in his official capacity for actions taken under
color of law.

of the Help America Vote Act of 2002, 42 U.S.C. § 15481 et seq.
25 Pa. Cons. Stat. § 2621 (b), (e.1), (h).[6]

The Secretary "may issue directives or instructions for
the implementation of electronic voting procedures and for the
operation of electronic voting systems."  25 Pa. Cons. Stat.
§ 3031.5(a).  In August, 2008, Secretary Cortes issued a
Memorandum addressing the proper number of emergency paper
ballots to be distributed to each precinct in the event of voting
system malfunctions on November 4.  That Memorandum states:

> We believe that providing to each election
> district a number of emergency paper ballots
> equal to 20% of the number of registered
> electors in each district is a reasonable
> formula for determining how many emergency
> paper ballots to make available on location
> at each election district.

On September 3, 2008, Secretary Cortes promulgated the
Directive at the heart of the present controversy.  It mandates
that local election officials distribute paper ballots to
eligible voters but only if **all** of the electronic voting machines
in a polling place are inoperable.  It states in relevant part:

> ... if **all** electronic voting machines in a
> precinct are inoperable, "paper ballots,
> either printed or written and of any suitable
> form," for registering votes (described
> herein as "emergency back-up paper ballots")
> shall be distributed immediately to eligible

---

6.  Title III of the Help America Vote Act of 2002 provides:  (1)
voting system standards for voting systems used in any federal
election; (2) provisional voting and voting information
requirements for federal elections; and (3) computerized
statewide voter registration list requirements and requirements
for voters who register by mail for federal elections.  42 U.S.C.
§ 15481, et seq.

voters pursuant to section 1120-A(b) of the
Election Code.  Emergency back-up paper
ballots shall be used thereafter until the
county board of elections is able to make the
necessary repairs to the machine(s) or is
able to place into operation a suitable
substitute machine(s).

For this purpose, county boards of elections
may use, as "emergency back-up paper
ballots," ballots specifically designed for
use as emergency back-up paper ballots;
surplus, un-voted absentee ballots; surplus,
un-voted alternative ballots; ballots that
the county board of elections has supplied to
the district election board for use as
provisional ballots; or other paper ballots
that are "either printed or written and of
any suitable form."

It is undisputed that there are a total of 9,329

polling places in the 67 counties of Pennsylvania.  The four

largest counties have the following number:  1,681 in

Philadelphia County; 1,321 in Allegheny County; 425 in Delaware

County; and 418 in Montgomery County.  Of the polling places in

Philadelphia County, 4 have one machine, 1,523 have two, 144 have

three, 10 have four, and 2 have five machines.  Thus, over 90% of

Philadelphia's divisions or precincts are equipped with two

machines or less and over 99% have three machines or less.

Currently, there are six different types of direct-

recording electronic ("DRE") voting machines in use as the

primary method of voting in 50 of the 67 counties of the

Commonwealth.  Twenty-four counties use the ES&S iVotronic as the

primary voting machine, sixteen use the Premier (formerly

Diebold) AccuVote TSx, six use the Danahar 1242, two counties

employ the Sequoia AVC Advantage, and one county each uses the

Sequoia Edge and the Hart InterCivic eSlate v 4.1.1.  The total number of these machines is over 25,000.  Philadelphia, Allegheny, Delaware, and Montgomery Counties all have DRE machines.  The remaining 17 counties use ballot cards which are marked by voters and then read by optical scanners.

There are currently 8.7 million registered voters in Pennsylvania, of which approximately 1.1 million are in Philadelphia.  The registration rolls have increased statewide by an extraordinary 400,000 new voters for the upcoming election. It is estimated by election officials that the turnout on November 4 will be the highest on record.  It is anticipated that up to 80% of eligible voters will cast ballots in the Commonwealth and up to 75% in Philadelphia.  All agree that this will be an unprecedented election in terms of voter participation.

The polls in Pennsylvania will be open from 7:00 a.m. until 8:00 p.m.  It is undisputed that the heaviest concentration of voters will be in the early morning hours and then again after 5:00 p.m.

The court heard testimony from experts on the failure rate of DRE voting machines, as well as from fact witnesses, including election officials, as to specific failures of such machines in recent elections in Pennsylvania, including the primary election in April, 2008.  A number of voters testified about machine failures at their specific polling places and the necessity for them to leave for work before casting their vote

-6-

because of machine malfunction.  Another witness testified about
machine problems in a number of polling places in the Germantown
section of Philadelphia, with the result that voters left without
voting.

There was also evidence about the voting procedures and
counting of votes at the polling place on election day, as well
as about the concerns of election officials if the court should
order the relief requested by the plaintiffs.  Since there is
only a week remaining before election day, the limited time left
to notify local election officials and poll workers of any change
in procedure was a matter very much in the forefront.

Dr. Douglas Jones, a voting technology expert based in
Iowa, testified via videoconference regarding the probability of
voting machine failure.  He was familiar with the DRE machines in
use in Pennsylvania, including the Danahar 1242, Sequoia AVC
Advantage, the Premier (formerly Diebold), AccuVote Tsx, the ES&S
iVotronic, the Sequoia Edge and the Hart InterCivic eSlate v
4.1.3.  Dr. Jones, knowledgeable with respect to the few studies
and testing of DRE machines, opined that the failure rate for DRE
voting machines is between 8% to 10%.  Given that the majority of
the precincts are equipped with 2 to 3 machines, the 8% to 10%
failure rates means that, in his view, there is a probability
that 20-25% of the precincts will suffer some kind of failure.

Colletta Brady, a poll watcher in Cheltenham Township,
Montgomery County, testified that both of the DRE machines at her
precinct were inoperable from 7:00 a.m. until approximately 9:30

-7-

a.m. during the April, 2008 primary.  She observed a line of approximately 175 to 200 people waiting to vote on that morning. She also observed people leaving the polling place because they could not wait in line for hours to vote.

Geneieve Geis, a kindergarten teacher in West Norriton Township, Montgomery County, was actually instructed by an election official to "go home" because the machines were not working at her precinct.

Angel Coleman arrived at Pepper Middle School in Southwest Philadelphia at approximately 7:30 a.m. to vote on April 22.  She observed a line of approximately 20 to 25 people waiting to cast their ballot.  She was informed that only one of the two machines at the precinct was working.  She was not able to wait in the long line to vote because she had to go to work.

Douglas Jerolmack, a professor at the University of Pennsylvania and resident of West Philadelphia, testified that his precinct is equipped with two machines.  On April 22, he arrived at his polling station at 7:30 a.m. to vote.  At that time, the door to his polling place was closed and approximately 12 people were waiting outside to vote.  A poll worker informed him that neither of the 2 machines was working and that no one had voted yet.  The worker asked the people waiting in line to wait until the machines were fixed.  Mr. Jerolmack waited until 8:00 a.m. and then went to report the problem.  He returned to his polling station thereafter.  He was not able to cast his ballot until approximately 9:30 or 10:00 a.m. that morning.

-8-

Election officials testified as to the procedures poll workers must follow when a DRE machine breaks down.  They are trained to call a central phone bank where operators are standing by to take their calls regarding problems in the field. Philadelphia, for example, will have 15 operators fielding calls. Many of the voting machine problems reported to the operators can be fixed quickly as a result of diagnosis over the phone.  For instance, sometimes a machine is simply not plugged in or a poll worker has forgotten to do a simple task.  Marybeth Kuznick, the Elected Majority Inspector of Elections for Westmoreland County, testified that in the April, 2008 primary she called the operators because her "zero tape" wouldn't print,[7] a problem that could be fixed over the phone.  On April 22, 2008, 248 of the 460 calls to the phone bank operators in Philadelphia were resolved over the phone.

In those cases where the problem cannot be resolved over the phone, a technician is sent out to the polling place. The counties utilize "roving technicians" who are on the road throughout election day waiting to be dispatched to a particular precinct to solve a machine problem.  Philadelphia plans to have 64 technicians available to handle problems with machines on election day, each of which is stationed in a particular ward in

---

7.  A "zero tape" shows that there are no votes currently on the DRE machine.

the city.[8]  During the April 22 primary, these technicians were able to resolve problems more than 92% of the time.  The majority of the problems involved spent batteries and broken printers. Nonetheless, even minor repairs of this nature take approximately one hour to make after notification of a malfunction by election officials at the polling place.

In those instances where the technician is unable to resolve the problem, a substitute machine is required.  The extra machines in Philadelphia are housed in a warehouse on Wissahickon Avenue.[9]  Philadelphia has 197 extra machines on hand for November 4.  In the April, 2008 primary, Philadelphia replaced 15 machines from the warehouse.  The highest number Philadelphia has ever had to replace at a single election is 17 machines.[10]

Prior to substituting a new DRE machine, a computer operator has to prepare a cartridge with the correct names of the candidates for that precinct, including the proper candidates for state senator and state representative.  Robert Lee, the Voter Registration Administrator for the Voter Registration Division of the City Commissioners of the City of Philadelphia, testified that it should take approximately 10 to 12 minutes to get the substitute machine ready for operation.  However, it could take

---

8.  Montgomery County will have 12 roving mechanics driving throughout the county on election day.

9.  Montgomery County has 30 substitute machines on hand for election day at a warehouse in Norristown.

10.  Montgomery County has had to replace 5 machines within the last 12 years.

up to an hour and a half to have the substituted machine up and running at the precinct.

The experience of the Cheltenham, Montgomery County precinct during the April, 2008 primary is a good example of the delay that can be experienced in getting a substitute machine operational.  On April 22, the Judge of Elections for a Cheltenham Township, Montgomery County, precinct reported at 7:15 a.m. that neither of the two DREs was operational.  One of the machines ultimately needed to be replaced because a poll worker had inadvertently "closed the polls" on that machine rendering it inoperable for the entire day.  It took a "couple of hours" for that machine to be replaced.  No one was able to vote at Cheltenham for over two hours - until approximately 9:15 or 9:30 a.m.

In addition to voting on the DRE machines, many citizens cast paper provisional ballots,[11] paper absentee ballots, and paper ballots from overseas.  Election officials expect over 15,000 Pennsylvania provisional ballots and 30,000 to 40,000 overseas ballots in the upcoming election.  The

---

11.  Pursuant to 25 Pa. Cons. stat. § 3050(a.4)(1), an individual "who claims to be properly registered and eligible to vote at the election district but whose name does not appear on the district register and whose registration cannot be determined by the inspectors of election or the county election board shall be permitted to cast a provisional ballot."  Furthermore, if individuals are voting for the first time in a district and are unable to produce certification, they are permitted to cast provisional ballots.  An individual presenting a judicial order may cast a provisional ballot.  25 Pa. Cons. Stat. § 3050(a.4)(1).

provisional ballots are filled out and safeguarded at the
individual polling places.  In some counties, such as
Westmoreland, the absentee ballots are delivered to the polling
places on election day and are counted there.

Poll worker training is completed or nearing completion
in most counties.  Montgomery County has completed 15 of its 18
training classes and Philadelphia County only has two remaining
make-up training sessions left.  Philadelphia poll workers were
orally instructed on the Secretary's 100% Directive at their
training sessions and their training session handouts instructed
them that paper ballots are not to be used unless all of the
machines are inoperable.

Concerns were raised by election officials regarding
the potential for "overvoting" or casting more votes in a
particular race than permitted and errant marks or cross-outs on
the paper ballot.  The potential for fraud, manipulation,
alteration, forgery, duplication and theft was also raised.

Most prominent among their concerns, however, was
allowing citizens to vote by paper ballot will cause chaos and
confusion at the polling station and anger and frustration among
voters and poll workers.  Defendants noted that poll workers have
not been trained as to the simultaneous use of paper ballots and
DRE machines.

Emergency paper ballots have been heretofore used due
to the breakdown of all of the machines at a precinct.  There was
testimony that Allegheny, and Montgomery Counties have had

occasion to use paper ballots.  Defendants' witness, Harry VanSickle, the Deputy Secretary of the Commonwealth for Administration, was not aware of any reports of fraud or mishandling of paper ballots in connection with their use in these counties.

II.

As the parties seeking a preliminary injunction, the plaintiffs must prove that the following four factors favor preliminary relief:  (1) they have a likelihood of success on the merits; (2) they will suffer irreparable harm if the injunction is denied; (3) granting the injunction will not result in even greater harm to the nonmoving defendants; and (4) the public interest favors such relief.  Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Township Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004).  Our Court of Appeals has warned that the "grant of injunctive relief is an extraordinary remedy ... which should be granted only in limited circumstances." Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994) (citing Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988)).  This is especially so when the moving party seeks a *preliminary* injunction, which is brought before the parties have had the chance to fully develop the facts through discovery.  Id.

In deciding the pending motion, we must examine the effect of the plaintiffs' filing of their complaint and motion for injunctive relief a mere twelve days before the November 4

-13-

presidential election.  The U.S. Supreme Court has recognized the
practical difficulties and potentially disruptive effect of
implementing changes to a state's electoral system so close to
the date of the election, as well as the accompanying equitable
considerations that "might justify a court in withholding the
granting of immediately effective relief[.]"  Reynolds v. Sims,
377 U.S. 533, 585 (1964).  Furthermore, in U.S. v. City of
Philadelphia, No. 06-4592, 2006 WL 3922115 (E.D. Pa. Nov. 7,
2006), this court highlighted the implications to our notions of
federalism by the granting of such relief.  In that case, we
stated that "Sensitivity to the highly time-sensitive nature of
elections and the process leading up to them is appropriate and
necessary to preserve comity between the states and federal
government."  Id. at *2.

III.

We turn first to the question whether plaintiffs can
show a likelihood of success on the merits of their request that
the Secretary of the Commonwealth require local election
officials to distribute paper ballots to voters if 50% of the DRE
machines in their polling place are inoperable.

It goes without saying that the right to vote by
qualified citizens is a fundamental right guaranteed under
various provisions of the Constitution.  See U.S. Const. art. I,
§§ 2 & 4; art. II, § 1; and amend. I and XIV.  The Supreme Court
has declared that "No right is more precious in a free country
than that of having a voice in the election of those who make the

-14-

laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964).  In Williams v. Rhodes, the Supreme Court reiterated that the right to vote "rank[s] among our most precious freedoms." Williams, 393 U.S. 23, 30 (1968).

While it is axiomatic that voting is a fundamental right, it is also well established that the state may provide structure to and limitations on the voting process which may impose burdens on voters. Anderson v. Celebrezze, 460 U.S. 780, 788 (1983).  As the Supreme Court explained in Anderson:

> Constitutional challenges to specific
> provisions of a State's election laws
> therefore cannot be resolved by any "litmus-
> paper test" that will separate valid from
> invalid restrictions ....  [A court] must
> first consider the character and magnitude of
> the asserted injury to the rights protected
> by the First and Fourteenth Amendments that
> the plaintiff seeks to vindicate.  It then
> must identify and evaluate the precise
> interests put forward by the State as
> justifications for the burden imposed by its
> rule.  In passing judgment, the Court must
> not only determine the legitimacy and
> strength of each of those interests, it also
> must consider the extent to which those
> interests make it necessary to burden the
> plaintiff's rights.  Only after weighing all
> these factors is the reviewing court in a
> position to decide whether the challenged
> provision is unconstitutional.

Anderson, 460 U.S. at 789.

It cannot be denied that the malfunctioning of DRE voting machines, either because of human error or mechanical

failure, causes a significant injury whenever voters are
effectively denied the right to cast their ballots.

Some waiting in line, of course, is inevitable and must
be expected.  Citizens have to sign in at the polling place and
wait their turn to retire behind the curtain to cast their votes.
One must always choose between and among a number of candidates
for different offices listed on the ballot and often, as in this
election, there are questions to be read and considered.  All of
this takes time.

Nonetheless, there can come a point when the burden of
standing in a queue ceases to be an inconvenience or annoyance
and becomes a constitutional violation because it, in effect,
denies a person the right to exercise his or her franchise.
There is no bright line or "litmus-paper test."  As Anderson
teaches, we must consider all the relevant factors.

While all elections are important, this year a
president and vice-president of the United States will be chosen.
All agree that the number of voters at this election will
probably be the highest on record.  In addition to the obvious
interest in the top of the ticket, there are five or six
additional offices listed on this year's ballot plus four ballot
questions in Philadelphia and one state-wide.  It is undisputed
that the turnout as always will be concentrated in the first
several hours of voting before people go to work and after 5:00
p.m. after their return from work.  Even in the best of
circumstances, voters can expect and must tolerate more delay

-16-

than usual on November 4.  Nonetheless, we would be blind to reality if we did not recognize that many individuals have a limited window of opportunity to go to the polls due to their jobs, child care and family responsibilities, or other weighty commitments.  Life does not stop on election day.  Many must vote early or in the evening if they are to vote at all.

The evidence, not surprisingly, demonstrated that DRE voting machines, like all other machines, sometimes fail.  When that happens, time is of the essence.  The polls are open for one day and one day only and then for only 13 hours.  There is no rain date.  The potential for failure, of course, is an important consideration for the court in deciding whether to grant plaintiffs any relief.  This is not a matter we can decide through hindsight after the election has concluded, based on how many machines actually became inoperable on November 4 and the impact those failed machines had on the right to vote.  We must do our best, based on the record before us, to determine whether inoperable machines are likely to cause any serious burden to the fundamental right to vote which, as the Supreme Court has observed, "rank[s] among our most precious freedoms."

The facts establish that DRE machines will undoubtedly fail on November 4, whether or not they will fail at the rate suggested by Dr. Jones.  History is our guide.  Most likely, these failures will occur in the early hours of voting when turnout is highest.  In the 2008 primary election in Pennsylvania, 187 repairs in Philadelphia had to be made at

-17-

polling places.  On average, there was at least an hour of
downtime for each.  There is even greater delay when a machine
has to be replaced.  In Philadelphia, for example, once the
decision is made to replace an inoperable machine, the correct
ballot must first be configured for the particular division so
that it contains the correct candidates for local races such as
state senator and state representatives.  It then must be
transported to the polling place which could be miles from the
warehouse.  This can take up to several hours.  In the primary
election in April, 2008, 15 machines had to be replaced.  In
Westmoreland County, all machines were inoperable for a time at
the 2006 election because they had been improperly programmed.
More recently in Warren County, the machine in one precinct
malfunctioned and paper ballots had to be employed.  In a
division in Cheltenham Township, Montgomery County, the machines
were inoperable for several hours at the primary election in
April, 2008, and many voters left before voting.

        Based on the record before us, we find that there is a
real danger that a significant number of machines will
malfunction throughout the Commonwealth, and this occurrence is
likely to cause unacceptably long lines on November 4 due to the
circumstances outlined above.  We sincerely hope this scenario
will not occur, but we cannot allow our decision to be based on
hope.  The delay resulting from a situation where 50% or more of
the voting machines are inoperable will unduly burden and thus
deprive many citizens of their right to vote.  This injury, if it

-18-

occurs, will be of the gravest magnitude and will give rise to a violation of at least the Equal Protection Clause of the Fourteenth Amendment.  See O'Brien v. Skinner, 414 U.S. 524 (1974); Harper v. Va. State Bd. of Elections, 383 U.S. 663 (1966).

The Secretary of the Commonwealth recognizes the seriousness of the problem when DRE machines become inoperable. His Directive, however, mandates local election officials to distribute paper ballots only when all the voting machines in a polling place are not functioning.  He rejects the relief requested by plaintiffs that paper ballots should be handed out when 50% of such machines are not working.  He first maintains that the 50% rule would cause confusion and even chaos in the polling place.  Election officials in his view would be handing out paper ballots to some voters while others would be voting on the DRE machines.  We do not view this as a problem.  If a voter wishes to wait in line for the DRE machine, there is no reason why he or she cannot do so.  Others in a hurry to go to work or who have other compelling reasons may take advantage of a paper ballot.

Next, he contends that it would be difficult to provide privacy for voters using paper ballots.  We are not persuaded. At present, paper provisional ballots are available in every polling place to be filled out by those whose names may not be on the voter rolls.  It is anticipated that there may be as many as 15,000 at this election.  More significantly, if all machines in

-19-

a precinct are inoperable, he has instructed that paper ballots be provided.  Lack of privacy will be an even greater problem under those circumstances than if only 50% of the machines are inoperable.  Yet, he does not raise this issue when a larger number of people will be completing paper ballots.

Finally, he opposes the 50% rule because of concerns about safeguarding the integrity at the polling place of the votes cast on paper ballots.  However, this same issue will exist when 100% of the machine are inoperable, but he has decided that the need to allow individuals to vote is paramount under these circumstances.  In many counties, including Westmoreland, the paper absentee ballots are delivered to individual polling places during election day and are opened and counted by election officials when the polls close.  In addition, as noted above, provisional ballots are regularly cast at the polling place during the day.  Election officials are accustomed to safeguarding these types of paper ballots.  The Secretary has advanced no reason why paper ballots under this 50% rule would not be safeguarded in the same manner as other paper ballots.  It is significant that none of defendants' witnesses had any information that the integrity of paper ballots had been compromised in the hands of local election officials.

The Secretary also contends that voters using paper ballots may place extraneous marks or "overvote" on them and thus suffer having their ballot rejected - something that is not possible when using DRE machines.  While concededly this may

occur, it is no reason not to offer a paper ballot if the alternative is no other practical opportunity to vote at all. The use of absentee ballots and provisional ballots contains these same risks cited by the Secretary.  Yet, the benefits of paper ballots clearly outweigh any detriment not only in those situations where they are currently used but also when 50% of the voting machines are inoperable.

The defendant is also concerned that any changes in voting procedure a week before the election will be unduly burdensome.  According to the Secretary, it would be most difficult to communicate with local election officials at this late date.  They have all been trained on the 100% rule and to change to the 50% rule now would cause confusion and chaos. While we agree that this action was filed at the eleventh hour, there is still time for the Secretary to send a new Directive to election officials.  Furthermore, whenever there is a machine malfunction, the local election officials call a central number at the county election office.  Those answering the calls can easily be directed to advise local election officials that paper ballots are to be used if 50% or more of their machines are inoperable.  While it will require extra effort, we are confident that the Secretary can effectively communicate any court order to local election officials and that said officials will comply.

In sum, the justifications advanced by the Secretary of the Commonwealth for the refusal to adopt the 50% rule are weak at best.  The distribution of paper ballots to voters when 50% of

-21-

the machines are inoperable at a polling place is compelling to
protect their constitutional right to vote, and no state interest
has been advanced to reject it.  Indeed, plaintiffs' request for
relief is reasonable and even modest in light of the grave injury
they seek to prevent.

We conclude that plaintiffs have demonstrated a
likelihood of success on the merits.

IV.

It is also necessary to resolve whether or not
plaintiffs will suffer irreparable harm if the preliminary
injunction is not granted.  The answer is yes.  If relief is
refused, there is a real danger that many voters in the
Commonwealth will have their constitutional right to vote unduly
burdened.  We find that they will suffer irreparable harm if a
preliminary injunction is denied.

V.

We must further decide whether greater harm will be
caused to defendant by granting a preliminary injunction than
would be caused to voters by denying relief.  We find that the
granting of injunctive relief as requested will cause minimal
harm to defendants.  On this prong of the test, plaintiffs
clearly prevail.

VI.

Finally, we must determine whether the granting of a
preliminary injunction here is in the public interest.  The right
to vote is at the foundation of our constitutional form of

government.  Ultimately, all our freedoms depend on it.
Protection of this right under the circumstances presented here
is without question in the public interest.

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONAL ASSOCIATION FOR THE   :     CIVIL ACTION
ADVANCEMENT OF COLORED         :
PEOPLE STATE CONFERENCE OF     :
PENNSYLVANIA, et al.           :
                               :
          v.                   :
                               :
PEDRO A. CORTES, Secretary     :
of the Commonwealth of         :
Pennsylvania, et al.           :     NO. 08-5048
```

ORDER

AND NOW, this 29th day of October, 2008, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1)  the motion of plaintiffs for a preliminary injunction is GRANTED;

(2)  the Secretary of the Commonwealth, Pedro A. Cortes, is preliminarily ENJOINED to direct forthwith all the County Boards of Elections throughout Pennsylvania as follows:

> If 50% of electronic voting machines in a precinct are inoperable, "paper ballots, either printed or written and of any suitable form," for registering votes (described herein as "emergency back-up paper ballots") shall be distributed immediately to eligible voters pursuant to section 1120-A(b) of the Election Code.  Emergency back-up paper ballots shall be used thereafter until the county board of elections is able to make the necessary repairs to the machine(s) or is able to place into operation a suitable substitute machine(s);

(3)  the Secretary of the Commonwealth, Pedro A. Cortes, is further preliminarily ENJOINED to advise forthwith all

the County Boards of Elections throughout Pennsylvania that this Order supersedes his Directive to the contrary issued on September 3, 2008 and that his Directive in this regard is no longer in effect; and

       (4)   the plaintiffs shall post security in the amount of $500.

                BY THE COURT:


                /s/ Harvey Bartle III
                                              C.J.